**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| MAC PIERCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-CV-3432-PAB-NRN |
| | ) | |
| PHOTOBUCKET INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S AMENDED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS (DKT. 25)**

A decade after they stopped using Photobucket, Plaintiffs Pierce, Cumming, and Niki Hughes (the "User Plaintiffs") learned the company had deactivated their accounts, put their photos behind a paywall, and was planning to monetize their data to train artificial intelligence. Plaintiffs never agreed to Photobucket's new 2024 Terms, which sacrifice their rights to biometric privacy and a jury trial. Nevertheless, Photobucket claims that a single email binds not only the User Plaintiffs but also individuals like Plaintiff Sean Hughes who merely appear in photos on the site. Because Photobucket cannot prove that Plaintiffs actually knew about, much less consented to, the 2024 Terms and the arbitration agreement they contain, the Court must deny the Motion to Compel Arbitration and allow the case to proceed.

## BACKGROUND

In its heyday, Photobucket provided free and secure image storage and hosting that helped propel the explosive growth of social media into a ubiquitous part of daily life. *See generally* dkt. 1. The User Plaintiffs all signed up for and uploaded photos to Photobucket during

this period prior to 2013.[1] *Id.* ¶¶ 82–84, 96–97, 100–02. None of the Terms of Use the User Plaintiffs agreed to at that time contained arbitration agreements. Dkts. 25-3, 25-4, 25-5.

As internet technology evolved and improved, the usefulness of Photobucket declined and its services grew obsolete. *Id.* ¶¶ 44–58. The User Plaintiffs each stopped using Photobucket in the early 2010s, and none have used their accounts in over a decade. Ex. 1, Pierce Decl. ¶ 4, Ex. 2, Cumming Decl. ¶ 4; Ex. 3, Hughes Decl. ¶¶ 4–5. Over time, Photobucket adopted increasingly predatory tactics to generate revenue and regain relevancy. Dkt. 1 ¶¶ 51–59. Sometime around 2023 Photobucket announced that it "no longer support[s] free accounts," *see* Ex. 4, Kurson Decl. ¶ 6. It deactivated the User Plaintiffs' accounts and required they pay a fee to regain access to or use the accounts in any way. *Id.* ¶ 6, Ex. A; Ex. 1, Pierce Decl. ¶¶ 6, 8; Ex. 2, Cumming Decl. ¶¶ 6–7; Ex. 5 (metadata labelling User Plaintiffs' accounts as "predeactivated").

In 2024, Photobucket changed strategy again. If it could not get its former users to return and pay a subscription fee, even by locking their old photos behind a paywall, it would scrape the biometric data from their pictures and sell that data to the highest bidder. Dkt. 1 ¶¶ 62–81. To effectuate this change, Photobucket tried to implement new Terms on July 22, 2024, ("2024

[1] Ms. Cumming believes she used Photobucket sometime around 2010, not 2013 as represented by Photobucket. Ex. 2, Cumming Decl. ¶ 4. Plaintiffs note that Photobucket's user-record keeping may not be entirely reliable. First, Defendant needed to amend its Motion after further investigation led the company to discover "an earlier account creation date for Ms. Hughes." Dkt. 25 at 1 n.1. Second, Photobucket appears to rely on a publicly available internet archive, rather than actual internal records of its prior Terms. *See, e.g.*, Dkt. 25-3 at 2. Third, Photobucket does not show how, if at all, these Terms were communicated to the User Plaintiffs when they signed up. Fourth, Photobucket's metadata seems to contain no record of Mr. Pierce's request to delete his account. *See* Ex. 1, Pierce Decl. ¶ 12; Ex. 5 at 2 (metadata). This undermines the credibility of Photobucket's evidence that, for example, its emails to Plaintiffs went through. *Cf. Roberts v. Barreras*, 484 F.3d 1236, 1244 (10th Cir. 2007) (reversing dismissal for failure to exhaust based on defendants' incomplete and unreliable records).

Terms") giving it rights to sell any biometric data contained in the photographs in its possession and subjecting users to an arbitration clause. Dkt. 25-6. Photobucket claims to have started sending emails about its 2024 Terms to the addresses it had on file on July 18, 2024—just four days before the 2024 Terms took effect. Dkt. 25-2 ¶¶ 10, 15, 19–20. Someone trying to login to their account on Photobucket's website also was confronted with multiple unavoidable popups requiring their agreement to the 2024 Terms to proceed. *Id.* ¶¶ 22–23, 29–32. The User Plaintiffs deny receiving announcement and never agreed to the 2024 Terms. Ex. 1, Pierce Decl. ¶¶ 12–16; Ex. 2, Cumming Decl. ¶¶ 9–10; Ex. 3, Hughes Decl. ¶¶ 9–10. Moreover, Mr. Pierce explicitly rejected the 2024 Terms, a rejection that Photobucket acknowledged. Ex. 1, Pierce Decl. ¶¶ 12–14. Mr. Hughes, meanwhile, never even had a Photobucket account. Ex. 3, Hughes Decl. ¶ 14.

## LEGAL STANDARD

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (cleaned up). Before any presumption arises, the threshold question is "whether there is a valid and enforceable arbitration agreement in the first place." *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1305 (10th Cir. 2017). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Vaughn v. JP Morgan Chase & Co.*, 707 F. Supp. 3d 1042, 1047 (D. Colo. 2023) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The party seeking to compel arbitration "bears the burden of demonstrating that a valid arbitration agreement exists." *Id.* at 1047–48 (citing *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)). Similar to the summary judgment standard, courts give

the party opposing the motion "the benefit of all reasonable doubts and inferences that may arise," and only "grant a motion to compel arbitration if there are no genuine issues of material fact regarding the parties' agreement." *Hancock*, 701 F.3d at 1261 (cleaned up).[2]

## ARGUMENT

### I. Photobucket Cannot Show That the User Plaintiffs Agreed to Arbitration

The User Plaintiffs did not agree to the 2024 Terms, and Photobucket cannot show otherwise. Whether viewed as a proposal for a new contract or a modification to the prior agreements between Photobucket and the User Plaintiffs, Photobucket must demonstrate that all elements of contract formation—offer, acceptance, and consideration—are met with respect to the 2024 Terms and the arbitration clause included therein. *See Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024) (contract formation); *IHS Markit, Ltd. V. Colliers Int'l WA, LLC*, No. 19-cv-876-JLK, 2021 WL 5104672, at *7 (D. Colo. Oct. 12, 2021) (contract modification).[3]

[2] Photobucket assumes that the laws of Colorado, California and New York govern, based on the choice of law provisions in the various iterations of Photobucket's Terms. Dkt. 25 at 5. But there is a "logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid." *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006); *see also Boulder Falcon, LLC v. Brown*, 720 F. Supp. 3d 1175, 1186–87 (D. Utah 2024). Instead, formation is likely governed by the law of Illinois and Iowa, where the Plaintiffs lived when Photobucket alleges they became bound to the 2024 Terms. Fortunately, the Court need not untangle this knot because the relevant law of contract formation in all of these states is substantially the same. *See Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025). Plaintiffs therefore draw on caselaw from each of these jurisdictions to show Photobucket cannot carry its burden.

[3] *Accord Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 83 N.E.3d 1027, 1043 (Ill. App. Ct. 2017) (formation); *All Am. Roofing, Inc. v. Zurich Am. Ins. Co.*, 934 N.E.2d 679, 449 (Ill. App. Ct. 2010) (modification); *Myers v. Myers*, 955 N.W.2d 223, 229 (Iowa Ct. App. 2020) (formation); *Farmers Coop. Soc., Sioux Ctr., Iowa v. Leading Edge Pork LLC*, 2017 WL 3097163, at *8 (W.D. Iowa July 20, 2017) (modification).

To meet this burden, Photobucket relies on a combination of constructive notice and inaction. Such reliance is unavailing. At a minimum, genuine issues of material fact preclude an affirmative finding that the User Plaintiffs received notice of the 2024 Terms. And even assuming that they did, Photobucket has not shown that the Plaintiffs' failure to act in response to this notice would constitute assent. Given their course of dealing with Photobucket over the past decade—which amounted to being spammed by emails from the company stating they needed to pay money to access their accounts—the User Plaintiffs' failure to take any action in response to an email did not manifest an intent to be bound by the 2024 Terms.

### A. Photobucket never communicated an effective offer to the User Plaintiffs

Because Photobucket cannot show that the 2024 Terms were communicated to the User Plaintiffs, the User Plaintiffs are not bound by its provisions. An "offer" is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts, § 24 (1981). An offer must be communicated to the offeree to be effective. *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo. 1990); *Word v. City of Chi.*, 946 F.3d 391, 397 (7th Cir. 2020).

Photobucket first contends that the User Plaintiffs had actual notice thanks to an email sent "on or around July 18, 2024." Dkt. 25 at 8. However, the User Plaintiffs, having checked their email accounts, deny ever receiving or seeing this email until it was filed in the course of this litigation. Ex. 1, Pierce Decl. ¶ 15; Ex. 2, Cumming Decl. ¶ 9; Ex. 3, Hughes Decl. ¶ 9. Plaintiffs attest that, given the history of useless emails received from Photobucket, it is very possible that if the email reached their inbox it was filtered as spam and deleted. *See* Ex. 1, Pierce Decl. ¶ 6; Ex. 2, Cumming Decl. ¶ 6; Ex. 3, Hughes Decl. ¶ 8. This "evidence is sufficient

to rebut any presumption of delivery and receipt of the notice at the summary judgment stage." *York Invs., LLC v. Border Parts Grp., Inc.*, 2025 WL 1179579, at *4 (D.N.M. Apr. 23, 2025).[4]

Perhaps anticipating difficulty proving actual notice, Photobucket advances a constructive notice argument that relies heavily on the modification clauses in its previous agreements allowing it to "modify," "amend," or "change" the agreements by posting the amended terms to photobucket.com. Dkt. 25 at 6–7, 10–11; dkts. 25-3 at 2, 25-4 at 2, 25-5 at 3. The User Plaintiffs agree that they once had agreements with Photobucket. *See* dkt. 1 ¶¶ 176–197. Nevertheless, Photobucket's constructive notice argument fails for three reasons.

First, Photobucket overstates the effects of the modification clauses. The User Plaintiffs never "agreed to and undertook the obligation to monitor the website to stay apprised of important disclosures." Dkt. 25 at 7. The earlier terms merely advised the User Plaintiffs that updated terms could periodically be posted on the website. The User Plaintiffs agreed, at most, that continued "use" of the website after a modification would suffice to show assent to that modification. *See* Dkts. 25-3 at 2 (Pierce Terms), 25-5 at 3 (Cumming Terms stating "so long as you've used the Site after the change . . . "). Moreover, the version of the Terms Photobucket posits controlled as to Mrs. Hughes did not even provide that much, saying zero about continued "use" of the website constituting agreement. *See* dkt. 25-4.

---

[4] To the extent Photobucket also contends that the website popups provided actual notice, only Mr. Pierce encountered one of these popups months later after following a link in one of Photobucket's many emails in November 2024. *See* Ex. 1, Pierce Decl. ¶¶ 10–12. Mr. Pierce reacted to this popup by immediately sending a rejection email. *Id.* Photobucket's prompt response that "I understand you prefer not to agree to our new Terms of Use, and would like to download your images and delete your account," *id.* ¶ 13, indicated an acceptance of Mr. Pierce's rejection and waived any right to enforce the 2024 Terms against him. *Cf. Avicanna Inc. v. Mewhinney*, 487 P.3d 1110, 1113–14 (Colo. Ct. App. 2019) ("It is well-settled that a party may waive a provision that was included in a contract for that party's sole benefit.").

This distinguishes the circumstances here from the cases cited by Photobucket, in which consumers had explicitly agreed to receive important notices electronically prior to the amendments and so undertook an obligation to monitor digital sources for electronic disclosures. *E.g. Needleman v. Golden 1 Credit Union*, 474 F. Supp. 3d 1097, 1102-05 (N.D. Cal. 2020) (finding constructive notice where a user agreed to receive all important notifications in his online banking portal). It also means that, under the initial contracts, both notice of changes to the Terms and demonstrating assent to such modifications hinge on **accessing** the Photobucket website. *See, e.g.*, Dkt. 25-5 at 3 ("so long as you've used the Site after the change . . . you agree to the current posted version of the Terms." ). It has been a decade since the User Plaintiffs accessed their accounts, and so Photobucket cannot demonstrate they received notice of or agreed to the 2024 Terms through interacting with the website. Ex. 1, Pierce Decl. ¶ 4; Ex. 2, Cumming Decl. ¶ 4; Ex. 3, Hughes Decl. ¶ 6.

Second, the modification clauses did not alert users that future changes could include adding an arbitration provision and did not contemplate superseding agreements. *See Burgardt v. Golden 1 Credit Union*, No. C092637, 2022 WL 440842, at *8 (Cal. Ct. App. Feb. 14, 2022) (concluding that a change-in-terms provision did not permit a bank to add an arbitration agreement (citing *Sevier County Schools Federal Credit Union v. Branch Banking & Trust Co.*, 990 F.3d 470 (6th Cir. 2021))). Even so, the modification clauses only allowed Photobucket to "modify," "amend," or "change" the existing agreements. But the 2024 Terms, "EXPRESSLY SUPERSEDE PRIOR AGREEMENTS OR ARRANGEMENTS WITH YOU" and "constitute[] the entire and exclusive agreement between the parties." Dkt. 25-6 cl. 2, 13.1 (all caps in original). Because they unmistakably intend to supplant and discard the previous agreements, the

2024 Terms are no mere modification, amendment, or change—they seek to wipe the slate clean and begin a new contractual relationship. *See Chavarria v. Bruce Nagel & Partners Architects, P.C.*, 230 A.D.3d 1286, 1289 (N.Y. App. Div. 2024) (modifications leave some provisions of the original contract intact). The User Plaintiffs did not agree in the original modification clauses that such a root-and-branch rewriting of the user agreement would become effective simply through posting on the website, and such posting was therefore insufficient to provide notice.

Finally, Photobucket itself already terminated the contracts between the parties. Each of the User Plaintiffs signed up for free Photobucket accounts that allowed image hosting and never agreed to pay nor actually paid a subscription fee to Photobucket. *See* Dkts. 25-3, 25-4, 25-5. Each of these agreements also allowed Photobucket to terminate the User Plaintiffs' membership and/or use of Photobucket's services at will. *Id.* Prior to adopting the 2024 Terms, Photobucket exercised this right. Beginning sometime by early 2024 and continuing through the present, Photobucket stopped supporting free accounts altogether and discontinued account access for any former user who did not have a paid subscription. *See* Ex. 4, Kurson Decl. ¶ 6, Ex. A; Dkt. 25-6 cl. 3.6.2 (2024 Terms: "may not continue to access [your old free account] unless and until you select a Paid Account"). Around this same time, Photobucket also sent emails to the User Plaintiffs indicating that their accounts were "deactivated" or that they would need to reactivate their accounts "If you would like to keep your account and any photos you have uploaded." Ex. 1, Pierce Decl. ¶ 8, Ex. A; Ex. 2, Cumming Decl. ¶ 7; *see also* Ex. 5 (metadata confusingly describing the User Plaintiffs' accounts as "predeactivated.")

In other words, in order to **use** their Photobucket accounts in any way, the User Plaintiffs would not only need to "reactivate" their accounts but would also need to pay for a subscription.

Even though Photobucket opted not to fully delete the deactivated account data of the User Plaintiffs, Photobucket unambiguously exercised its right to terminate its contractual relationship with them by ending their free accounts and prohibiting them from accessing or using Photobucket unless and until they became paid subscribers. "A contract that is terminated ceases to bind the parties" as to new obligations and "cannot be extended or modified" unless the elements establishing formation of a new contract are met. *Citizens for Amending Prop. L v. City of Pomona*, 28 Cal. App. 5th 1159, 1189 (Cal. Ct. App. 2018); *see also Harris v. Reagan*, 161 A.D.3d 1346, 1348 (N.Y. App. Div. 2018).

In short, the previous contracts between Photobucket and the User Plaintiffs provide Photobucket with no shortcuts for binding the User Plaintiffs to the 2024 Terms. This fact distinguishes all of Photobucket's cases regarding constructive notice and inaction. And there is at least a genuine dispute of material fact as to whether the 2024 Terms were sufficiently communicated to the User Plaintiffs to constitute an effective offer.

### B. The User Plaintiffs made no manifestation of intent to be bound

Photobucket has also failed to show that the User Plaintiffs made any manifestation of intent to be bound by the 2024 Terms. The law defines acceptance as "words or conduct that, when objectively viewed, manifests an intent to accept an offer." *Wingard v. TBK Bank, SSB*, --- F. Supp. 3d ----, No. 23-cv-2116, 2025 WL 605265, at *4 (D. Colo. 2025). "While assent may be implied from the totality of circumstances and the acts of the parties, it must appear in some form." *Id.* (citation omitted). Further, "absent a prior course of dealing, silence accompanied by inaction is insufficient to constitute acceptance." *Williams v. County of Cook*, 524 F. Supp. 3d 813, 818 (N.D. Ill. 2021); *Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013) (similar); *Haberl*

*v. Bigelow*, 855 P.2d 1368, 1374 (Colo. 1993) (similar). Absent any explicit written evidence of agreement—which does not exist—Photobucket's arguments that the User Plaintiffs assented to the 2024 Terms and the arbitration agreement they contain, *see* dkt. 25 at 11–13, all misunderstand the facts and ignore the actual course of the litigants' relationships.

First, Photobucket's reliance argument is clearly misplaced. Plaintiffs' breach of contract claim is premised on their *not consenting* to the 2024 Terms. Plaintiffs claim that Photobucket's use of biometric data from their pictures without their consent violates the earlier contracts Photobucket entered into with Plaintiffs. *See* Dkt. 1 ¶¶ 176–97; Dkt. 25-3 at 2 (survival clause).

Second, the User Plaintiffs had no legal obligation to affirmatively reject or opt-out of the 2024 Terms. "The mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Restatement (Second) of Contracts § 69 cmt. c (1981); *see also Williams*, 524 F. Supp. at 818; *Rucker*, 828 N.W.2d at 602; *Haberl*, 855 P.2d at 1374. Although an offeree can manifest intent to accept through silence and inaction, such circumstances depend on the prior course of dealing of the parties. *See, e.g.*, *Burgardt*, 2022 WL 440842, at *8 (distinguishing *Needleman*).

Here, the parties' prior course of dealing does not support acceptance through silence. As noted above, the modification clauses in the original Terms conditioned assent to modification only of the old Terms and only on visiting the Photobucket website, which Plaintiffs have not done in years. More importantly, Photobucket had already terminated the initial agreements containing the modification clauses. These arguments apply with equal force here—the modification clauses in the initial contracts provide no guide to the parties' course of dealing.

Furthermore, the actual course of the parties' dealing undermines any argument that the

User Plaintiffs' silence operated as assent. The User Plaintiffs last "used" Photobucket many years ago. *See* Ex. 1, Pierce Decl. ¶ 4; Ex. 2, Cumming Decl. ¶ 4; Ex. 3, Hughes Decl. ¶ 6. When they no longer had a need to use Photobucket, they ceased visiting the website, allowed their accounts to go dormant, and began ignoring efforts from Photobucket to get them to purchase paid subscriptions. Ex. 1, Pierce Decl. ¶¶ 4, 6–10; Ex. 2, Cumming Decl. ¶¶ 4, 6–8; Ex. 3, Hughes Decl. ¶¶ 6, 8. Photobucket, meanwhile, deactivated their accounts, ended the free membership program under which those accounts had been created, and stopped allowing the User Plaintiffs to even access their accounts without a paid subscription. *See* Ex. 1, Pierce Decl. ¶¶ 7–10; Ex. 2, Cumming Decl. ¶¶ 7–8; Ex. 4, Kurson Decl. at ¶ 6, Ex. A; Dkt. 25-6 cl. 3.6.2. All of this behavior shows the parties going their separate ways. Photobucket's unilateral attempt to impose the 2024 Terms on the User Plaintiffs so it could sell their biometric data in violation of their prior promises, without compensation and without judicial recourse is entirely contrary to the parties' prior course of dealing. No reasonable person could conclude from this record that the User Plaintiffs' silence evidences an objective manifestation of intent to be bound.

Third, Photobucket contends that the User Plaintiffs are "continuing to store their photographs with Photobucket," and are therefore bound by the 2024 Terms. Dkt. 25 at 12. The User Plaintiffs do not deny that Photobucket has possession of their photographs, but Photobucket's unilateral decision to hold on to these photos (with an eye towards monetizing them to train AI systems) after terminating its previous contracts with the User Plaintiffs does not constitute Plaintiffs' "continued use of" Photobucket. Photobucket cut off the User Plaintiffs' account access and locked their photos behind a paywall months before it tried to bind them to the 2024 Terms. *See* Ex. 1, Pierce Decl. ¶¶ 7–10; Ex. 2, Cumming Decl. ¶¶ 7–8; Ex. 4, Kurson

Decl. at ¶ 6, Ex. A; Dkt. 25-6 cl. 3.6.2. Especially after a decade of having no interactions with their accounts, Plaintiffs had no reason to think that as of July 2024 they were "using" Photobucket—nor would any reasonable person in Plaintiffs' position.

Furthermore, Photobucket made it nearly impossible for the User Plaintiffs and others to actually retrieve their pictures without agreeing to the 2024 Terms because it knew those terms charted an entirely new course of dealing between it and its customers that could be hugely lucrative for it. By its own admission, some users were not notified of the new Terms until July 23, 2024, after they had already gone into effect. Dkt. 25-2 ¶¶ 15, 19, 20, 25. Even if an account holder timely received the notice email—the User Plaintiffs all contend they did not—the links in that email led users on a labyrinthine and confusing goose chase. By Photobucket's own admission, users were required to navigate through no less than seven screens and past multiple misleading popups suggesting they had to choose between never recovering their photos or agreeing to the new 2024 Terms and shelling out money before finally reaching a screen that provided an opportunity to download their images. *See* Dkt. 25-2 ¶¶ 24–32. Photobucket's argument that anyone who did not make it through this confusing process is just as bound to the 2024 Terms as someone who affirmatively consented reveals the unconscionability of the entire scheme. The User Plaintiffs quit using Photobucket years ago. But Photobucket kept possession of their photos, and it is trying to use that possession to bind the User Plaintiffs to a contract they do not consent to. The Court should not reward such coercive behavior.

## II. Photobucket Cannot Show That Any Arbitration Agreement Binds Sean Hughes

Even if the Court were to find that the User Plaintiffs agreed to the arbitration provision in the 2024 Terms, Mr. Hughes did not. Mr. Hughes affirmatively disclaims that alleged

agreement and claims instead that he was a third-party beneficiary of Mrs. Hughes's 2006 contract with Photobucket (which protected his biometric data and did not contain an arbitration provision). Dkt. 1 at ¶ 193; Dkt. 25-4. As already discussed at length, the 2024 Terms make clear that they are a new, superseding agreement repudiating the data privacy provisions of the prior agreement. *See* Dkt. 25-6 cl. 2, 13.1. No evidence in the record suggests that the 2024 Terms "manifest an intent to confer *specific legal rights* upon" Mr. Hughes so as to make him a third-party beneficiary of that contract. *N.A. Rugby Union LLC v. United States of Am. Rugby Football Union*, 442 P.3d 859, 865–66 (Colo. 2019) (cleaned up).

Furthermore, Photobucket cites no precedent that would justify concluding that Mr. Hughes is further bound to arbitrate the non-contractual claims he brings. *Contra, e.g.*, *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 & n. 24 (Tex. 2005) (collecting cases for the proposition that notwithstanding an arbitration agreement, a third-party's "claims can be brought in tort (and in court) if liability arises from general obligations imposed by law."). Photobucket's contrary argument appears to be that no one whose likeness is uploaded to its platform can ever sue it in court because, by virtue of the picture being on the site after July 22, 2024, the uploading user has implicitly agreed to an arbitration clause binding everyone in their photos. The breadth of this position is stunning, and the Court should reject it.

## III. Plaintiffs Did Not Knowingly and Voluntarily Waive Their Right to a Jury Trial

"The right to trial by jury is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 121 (2024) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)). The arbitration provision in the 2024

Terms entails such a curtailment of this right. *See Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 838 (10th Cir. 1988). The waiver of a right to a civil trial by jury must be "knowing and voluntary." *Hulsey v. West*, 966 F.2d 579, 581 (10th Cir. 1992). Thus, an arbitration clause that waives the Seventh Amendment right to a jury trial, like the one at issue here, is not effective if it is not knowing and voluntary. *See, e.g.*, *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 421 (6th Cir. 2011) ("[E]ven if an arbitration agreement were formed, on these facts Hergenreder did not knowingly and voluntarily waive her right to a jury trial.").

"The Tenth Circuit has not determined who carries the burden of demonstrating whether [a Seventh Amendment] waiver was knowing and voluntary; however, the majority of courts have decided that the burden lies with the party seeking to enforce the contractual waiver." *Little v. Gray Media Grp., Inc.*, 717 F. Supp. 3d 1058, 1061–62 (D. Kan. 2024) (quotation omitted). Courts in this Circuit primarily consider four factors when applying the knowing and voluntary standard: "(1) whether the clause containing the waiver was conspicuous; (2) whether there was a gross disparity in bargaining power between the parties; (3) the business or professional experience of the party opposing the waiver; and (4) whether the party opposing the waiver had an opportunity to negotiate contract terms." *Id.* (quotation omitted).

Photobucket's argument based on constructive notice and inaction cannot satisfy the knowing and voluntary standard. First, there is no evidence that the Plaintiffs made any affirmative voluntary act demonstrating knowing agreement to waive their jury rights. Second, the July 2024 notice emails do not inform users that by doing nothing they would be waiving their right to a jury. *See, e.g.*, *Brody v. CultureSource*, 2020 WL 6562089, *34 (E.D. Mich. Nov. 9, 2020) (finding arbitration provision valid under state law but holding that its lack of clarity

and detail precluded plaintiff from making a knowing and voluntary jury waiver). Third, as discussed above, the Plaintiffs had no opportunity to negotiate and faced a confusing and misleading process to even recover their photos without agreeing to the 2024 Terms. Finally, there is a gross disparity in sophistication and bargaining conditions between Photobucket and the Plaintiffs, consumers whose accounts Photobucket had already deactivated and who had endured repeated efforts by Photobucket to use their photos as leverage to get them to sign up for a paid subscription. In sum, because Plaintiffs "did not knowingly and voluntarily waive their constitutional right to a jury trial," they cannot "be compelled to arbitrate their claims." *Walker v. Ryan's Fam. Steak Houses, Inc.*, 400 F.3d 370, 381 (6th Cir. 2005).

## IV. Plaintiffs' DCMA Claims are Not Subject to Any Arbitration Agreement

Photobucket's motion ignores Plaintiffs' claims arising under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. *See* Dkt. 1 ¶¶ 227–45. Photobucket chose to exclude from arbitration "injunctive or other equitable relief . . . to prevent the actual or threatened infringement, misappropriation or violation of a party's . . . intellectual property rights." Dkt. 25-6 cl. 14.1; *see also* Dkt. 25 at 14–15. Plaintiffs' DMCA claims seek equitable relief and fall squarely within this exception. If nothing else, Plaintiffs' "resort to the district court [is] within [their] contractual rights" as to their copyright claims for injunctive relief and must be honored even if their other claims are stayed. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 728 (10th Cir. 1988).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny entirely Photobucket's Amended Motion to Compel Arbitration and Stay Proceedings.

Respectfully submitted,

*/s/ Aaron M. Tucek*
One of plaintiffs' attorneys

Mike Kanovitz
Aaron Tucek
Isaac Green
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(P) (312) 243-5900
(F) (312)-243-5902
mike@loevy.com
aaron@loevy.com
green@loevy.com

Daniel Twetten
LOEVY & LOEVY
2060 Broadway Street, Suite 460
Boulder, CO 80302
(P) (720) 583-6514
(F) (312)-243-5902
dan@loevy.com

**CERTIFICATE OF SERVICE**

I, Aaron M. Tucek, an attorney, hereby certify that on May 16, 2025, I served the foregoing response to Defendant's Amended Motion to Compel Arbitration and Stay Proceedings on all counsel of record electronically by filing it via CM/ECF.

*/s/ Aaron M. Tucek*