## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| MAC PIERCE, NIKI HUGHES, SEAN HUGHES, and VALERIE CUMMING, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PHOTOBUCKET.COM, INC. AND UNKNOWN DEFENDANTS,<br><br>Defendants. | Case No.: 1:24-CV-3432-PAB-NRN<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED CLASS ACTION COMPLAINT

Now comes Plaintiffs MAC PIERCE, NIKI HUGHES, SEAN HUGHES, AND VALERIE CUMMING, by and through the undersigned attorneys, Loevy & Loevy, and complaining of Defendants PHOTOBUCKET.COM, INC. and UNKNOWN DEFENDANTS, state as follows:

### INTRODUCTION

1.     This action for damages and injunctive relief seeks to prohibit Photobucket, Inc. from misusing photographs entrusted to it by Plaintiffs and millions of other Americans ("Plaintiffs" or "the Class"). Among other highly concerning invasions of Plaintiffs' rights, Photobucket is threatening to sell Plaintiffs' images to third parties who can use them to create biometric facial recognition databases that intrude on Plaintiffs' privacy by identifying them wherever they go. Additionally, Photobucket hopes to monetize Plaintiffs' photos through the application of artificial intelligence which, among other violations, can create new images bearing a Plaintiff's likeness, sometimes called "deep fakes" when used to defraud, and to build algorithms

that reproduce Plaintiffs' photographs and derivative materials in violation of Plaintiffs' copyrights and publicity rights.

2.    None of these uses were contemplated by Photobucket's customers. The photos at issue, amounting to over 13 billion images, were entrusted to Photobucket over the course of almost two decades beginning in the early aughts – years before technologies like generative AI and biometrics existed outside of science fiction. When it encouraged customers to upload their photos, Photobucket never gave them notice that it might one day appropriate them for biometric data or machine learning. Rather, Photobucket told users that it was a cloud storage service for customers who wished to view their photos online, and it repeatedly promised users to respect their rights to their data and intellectual property and to be a responsible steward of the photographs entrusted to it. Back then Photobucket earned revenues by charging monthly fees and displaying advertisements.

3.    As with many other dotcoms of the early internet, Photobucket has seen its popularity and usage dwindle over the last decade. Since the early 2010s most users have allowed their accounts to go dormant. But the 13 billion images they uploaded during Photobucket's heyday remain on the company's servers.

4.    Recently, Photobucket started rebranding itself as a player in the AI industry, announcing to the business press that the 13 billion photos on its servers represent a massive opportunity to profit from the boom in artificial intelligence and its voracious need for photographs to train its algorithms. At about the same time, Photobucket has attempted to amend its user agreement to impose consent to AI and biometrics on its millions of customers—most of whom have not engaged with the Photobucket services for years. It has done so with fraudulent and coercive emails encouraging customers to log in lest it erase their photos and then giving them the

2

choice between consenting to Photobucket using their biometrics or losing their data. For those who did not engage with the emails, Photobucket takes the position that, by their silence, they have implicitly consented to Photobucket's use of their photos for biometrics and AI.

5.      Photobucket's strongarm tactics, however, are illegal. In addition to Photobucket's improper threats to breach its prior promises to safeguard the photos, its "negative option" consent tactics violate the provisions of its prior user agreements for changing the terms of service. These prior agreements require post-amendment use of the website to consent to new terms. Likewise, the notification Photobucket provides to the Class members who do log in is confusing and insufficient under the law to constitute knowing consent to such onerous uses of a person's likeness and works under applicable law. Finally, many Class members are persons who appear in photographs that friends and family uploaded to Photobucket but who have never been Photobucket customers themselves. They are not bound by any user agreement in the first place.

6.      Accordingly, Photobucket lacks legal authority to use the 13 billion photos for biometrics or other AI and, consequently, cannot license the photos to third parties for such uses. Plaintiffs seek an injunction to prohibit such licensing, to claw back photos that Photobucket has already licensed for these purposes and to recover penalties and damages for each violation. Plaintiffs bring their claims under federal copyright protections (the Digital Millenium Copyright Act), applicable statues that prevent the non-consensual use of biometric data (such as Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq, and similar provisions of New York, California, and Virginia law), consumer protection statutes (such as the Colorado Consumer Protection Act, C.R.S. 6-1-113, and similar statutes), contract, and common law.

## PARTIES

7.      Plaintiff Mac Pierce is a resident of Chicago, Illinois. He is an artist and used Photobucket to store digital art. The data he entrusted to Photobucket includes his face.

8.      Plaintiff Niki Hughes is a resident of Illinois. She opened a Photobucket account and used Photobucket to store pictures, some of which included pictures of her minor child and husband. She believes that she has not uploaded new pictures nor used the service to view her photos in approximately a decade.

9.      Plaintiff Sean Hughes, Niki Hughes's husband, is a resident of Illinois. He was never a customer of Photobucket.

10.     Plaintiff Valerie Cumming is a resident of Iowa. Plaintiff Cumming used Photobucket's service in the early 2000s.

11.     Plaintiff Cumming last logged into Photobucket around 2010 but has received numerous emails from Photobucket indicating that it still has her photos stored on its servers.

12.     Defendant Photobucket, Inc. is a privately-held company incorporated in Colorado with its principal place of business in Denver, Colorado. Photobucket was an early entrant in the online photo storage market, having opened its business to serve users of the MySpace social media site over 20 years ago. Over the decades the need for its services and thus its popularity waned. Nevertheless, Photobucket persisted by marketing itself as a fiduciary of sorts, protecting fond memories from the people who entrusted their photos, sometimes getting customers to pay it for this service and sometimes serving ads to them when they would log on to view their photos. It presently holds over 13 billion photos

13.     Unknown Defendants are persons and entities, who have licensed Plaintiffs' photos from Photobucket and used them for applications including biometrics and generative artificial

4

intelligence applications. As detailed herein, Defendant Photobucket has referenced these entities both in its biometric privacy policy and in public statements discussing Photobucket's plan to license Plaintiffs' and Class Members' images to said entities. Upon learning the identities of said Unknown Defendants, Plaintiffs will amend this Complaint and effect service on said entities.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises, in part, under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and as members of the Class bring claims arising under federal law. Jurisdiction can also be found under the Class Action Fairness Act, 28 U.S.C. § 1332, because (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as Plaintiffs and Defendants are domiciled in different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

15.    This Court has personal jurisdiction over Defendant Photobucket because Photobucket is incorporated in Colorado and maintains its headquarters in Colorado.

16.    This Court has personal jurisdiction over the Unknown Defendants because, on information and belief, the Unknown Defendants regularly conduct business in Colorado and/or engage in and plan to continue engaging in negotiations and commercial transactions with Defendant Photobucket in Colorado, and Plaintiffs' injuries arise out of and relate to such negotiations and commercial transactions.

17.    Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Photobucket Announces and Implements its Plans to License Plaintiffs' Photographs For Artificial Intelligence Products**

18.      In 2024, Photobucket CEO Ted Leonard made public statements to the business and technology press indicating that Photobucket was in the process of licensing the billions of photos stored on its servers for biometrics and generative AI uses.

19.      In April 2024, Mr. Leonard told Reuters that he is in talks with multiple tech companies to license Photobucket's 13 billion photos and videos to be used to train generative AI models that can produce new content in response to text prompts.

20.      Mr. Leonard also told Reuters that he has discussed rates of between 5 cents and $1 per photo and more than $1 per video.

21.      In a May 2024 podcast, Mr. Leonard announced that "We believe that we are one of the most relevant players in the AI market because of the content we have on our platform and our ability to help leaders in the AI space train their models and evolve."

22.      In the same May 2024 podcast, Mr. Leonard further announced "It would have been really easy, when the company was struggling financially, to say 'hey, of these 13 billion images, 75% of them are from accounts that haven't been touched in five years. We could probably deprecate those and get rid of them.' But we chose not to. We made a commitment to the customer base that we will not delete images. And that has put us in a position to be opportunistic specifically around AI."

23.      In October 2024, Mr. Leonard told Business Insider that Photobucket was planning to license photos to AI companies, and that such licensing could begin soon.

24.     At the same time, Photobucket demonstrated its intentions to license the Class members' photos, including by purporting to adopt a new Biometric Information Privacy Policy (the "Biometric Policy") in July 2024.

25.     The Biometric Policy purports to allow Photobucket to license the photos of Plaintiffs and anyone else who does not maintain an active paid Photobucket subscription unless they opt-out.

26.     The Biometric Policy allowed an initial 45-day opt-out period. On information and belief, when Class members contacted Photobucket to object to the biometric use of their data after this period expired, Photobucket stated that it could no longer prevent the biometric use of their data expressly because their photos and videos may have already been licensed to third-parties and could not be recovered.

27.     It is unclear how much of Mr. Leonard's ambitious plans Photobucket has accomplished to date, but its communication with Plaintiff Pierce (described below) indicates that some photos have already been irrevocably shared with third parties for the purpose of training artificial intelligence. To be clear: according to Photobucket's own statements it both intends to and has begun to engage in the conduct alleged in this Complaint.

**B.      Photobucket and the Unknown Defendants Cannot Use Plaintiffs' Photographs For Artificial Intelligence Products Without Express and Informed Consent.**

28.     Photobucket's plan to license the 13 billion photographs for biometrics and generative AI uses is illegal because Photobucket is acting unilaterally and without obtaining valid consent. Photobucket must obtain knowing, written consent from the owners of the photos (i.e., its account holders) and every other person depicted in them.

7

29. For starters, extracting the Plaintiffs' biometrics without permission violates biometric privacy laws. In 2008, Illinois became the first state to enact a law protecting its citizens' biometric-identifying information from being used without their consent. The Illinois General Assembly enacted the Biometric Information Privacy Act (BIPA) to protect the privacy rights of every Illinois resident who has their unique, biometric identifiers captured or retained by self-interested, profit-obsessed companies. Ill. House Tr., 2008 Reg. Sess. No. 276; 750 ILCS 14/5.

30. In enacting BIPA, the General Assembly found that the sensitivity of biometric identifiers and/or biometric information warrants heightened protection because companies frequently collect it from individuals like Plaintiff and the other Class members. Specifically, the General Assembly found that "[b]iometrics are unlike other unique identifiers" like Social Security Numbers because they are "biologically unique to the individual" and cannot be changed if compromised. 740 ILCS 14/5(c). Thus, a person whose biometrics are compromised "has no recourse" and "is at heightened risk for identity theft." *Id.*

31. As the General Assembly recognized that "[t]he full ramifications of biometric technology are not fully known." 740 ILCS 14/5(e). Therefore, "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(f).

32. BIPA requires "private entities" that collect certain biometric identifiers or biometric information, or cause such information and identifiers to be collected, to take specific steps to safeguard the biometric data they collect, store, capture, or otherwise obtain. 740 ILCS 14/15. BIPA defines "biometric identifiers" as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. "Biometric information," in turn, is identified as "any

8

information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

33.    BIPA is an informed consent statute. Thus, companies that collect biometric identifiers or biometric information must obtain informed consent from consumers prior to collecting such data from them, and they must publicly disclose to consumers their uses, retention of, and schedule for destruction of the biometric information or identifiers that they do collect. *Id.*

34.    Among other requirement that are violated by Photobucket's scheme, BIPA prohibits private entities—such as each Defendant—from (1) selling, leasing, trading, or otherwise profiting from an individual's biometric identifiers and information, 740 ILCS 14/15(c); and (2) disclosing, redisclosing, or otherwise disseminating an individual's biometric identifiers or information without first obtaining consent, 740 ILCS 14/15(d).

35.    BIPA provides for statutory damages, injunctive relief, reasonable attorney's fees and costs, and other relief "as the State or federal court may deem appropriate" when a private entity violates a consumer's rights under the statute. *Id.* § 14/20. Where a violation is the result of a private entity's negligence, BIPA provides for the greater of actual damages or $1,000 in liquidated damages per violation. *Id.* If the violation was intentional or reckless, BIPA provides for the greater of actual damages or liquidated damages of $5,000 per violation. *Id.*

36.    Any use of the photos and videos in Photobucket's possession to train artificial intelligence models to recognize human facial features will necessarily involve scanning the images to locate facial images and extract numerical representations of the shape or geometry of each facial image, which would constitute a violation of BIPA.

37.    Multiple other states also protect their residents' distinctive biometric features—like digital representations of their face or facial features—from being used or sold without their consent.

38.    Virginia prohibits the unauthorized commercial use of a person's picture without their consent and provides for compensatory and punitive damages for knowingly doing so. Va. Code § 8.01–40(A). The Virginia Computer Crimes Act, also prohibits taking without authority or under false pretenses identifying information, including biometric data, in violation of the terms of service of the internet websites where they are stored. Va. Code § 18.2-152.1, *et seq*.,

39.    California too prohibits companies from knowingly using a person's "photograph[] or likeness, in any manner . . . without such person's prior consent," Cal Civ. Code § 3344(a), and from collecting or using "personal information," including "biometric information" without expressly informing consumers about "at or before the point of collection" of how the information will be used. Cal. Civ. Code §§ 1798.100(b), 1798.140(o)(1)(E).

40.    In New York, a person whose picture or likeness is knowingly used "for the purposes of trade without the[ir] written consent" may sue for an injunction and damages. N.Y. Civil Rights Law §§ 50-51.

41.    In addition to statutory protections like those listed above, many states have identified constitutional and common law privacy protections against the unconsented-to use of biometric data.

42.    Finally, Photobucket's user agreement itself protects the Plaintiffs and prohibits the use of photographs per its plans. All account holders but the handful of persons who may have affirmatively and informedly agreed to the new biometric policy, retain the protections of their prior contracts with Photobucket, which omit any consent to uses of the photos for machine

10

learning and biometrics. Such uses were not announced while other uses were and so are excluded and prohibited. Regardless, such onerous and invasive uses were beyond the contemplation of the contracting parties per se. Any such use now would be a breach of contract.

43.     Thus, Photobucket's licensing scheme, and any associated uses by the licensees, violate the forgoing provisions of law.

44.     That is because Photobucket is licensing photos to entities such as the Unknown Defendants, that are developing generative artificial intelligence models. These models are trained to develop realistic looking images of humans by ingesting and storing vast datasets of real images of real humans.

45.     Additionally, artificial intelligence designed to perform facial recognition and analysis, like models produced by some of Unknown Defendants, is often trained on large quantities of high-quality image datasets that are known to contain images of real human beings.

46.     On information and belief, this training often entails generating and storing biometric identifiers regarding individual human beings' facial geometry.

47.     The quality of a generative artificial intelligence model depends largely on the amount and quality of data that the model has been trained on.

48.     The trend in image-based artificial intelligence research and design has gone away from training models on smaller datasets (and having the model ingest the same photo hundreds of times) towards training models on larger and larger datasets with fewer passes (known as "epochs") through the datasets.

49.     As a result, generative artificial intelligence companies are racing each other to obtain large, fresh datasets of high-quality images, particularly datasets containing images of real human beings. This competition has only increased as the amount of new publicly available data

11

with which to train models, and thus to continue the exponential rate of improvement in artificial intelligence models, dwindles.

50.    On information and belief, generative artificial intelligence models trained on photos of real human beings use biometric information to produce computer-generated images that look uncannily like the real individual human beings in the images they have been trained on.

**C.    Photobucket Amasses 13 Billion Images from Plaintiffs**

51.    Photobucket was founded in 2003 as an online photo and video hosting site. For most of its history, Photobucket's image-hosting and storage services were free to use and were pitched to users as such.

52.    Users would create an account, upload photos, and then were able to share their photos by embedding links to the content on message boards, blogs, ecommerce sites such as Etsy and eBay, or social media platforms such as MySpace and Twitter.

53.    The photos users uploaded were often not simply pictures of themselves, but pictures of many different individuals, a substantial number of whom never had Photobucket accounts and therefore never agreed to any version of Photobucket's Terms of Use.

54.    Users did not merely upload photos to Photobucket. They also provided Photobucket various data related to their photos which, on information and belief, includes the following:

a.    Photobucket stored and associated author information with each image, including the name and location of the uploader, as well as other profile information linked to the account.

b.    The Defendant further collects and retains the IP address used at the time of uploading the image.

12

c.  Photobucket logged the exact date and time when each photo was uploaded to its platform. This date and time information was retained by the Defendant and included a timestamp indicating when the photo was uploaded, along with any timestamps reflecting subsequent edits or re-uploads of the image.

d.  Photobucket also collected and retained technical metadata embedded within the images uploaded to the platform, including but not limited to EXIF data. This metadata often included details such as geolocation data, the original creation date and time of the photo, the file format, size, and photo resolution, and the camera make, model, and technical settings used to capture the photo.

e.  Additionally, Photobucket collected and retained any title or description fields provided during the upload process or added while the photos were stored on the platform, as well as any tags or keywords associated with the photo that may serve to identify the image or its intended use.

f.  Photobucket also assigned unique identifiers or hash codes to each image for internal management purposes and maintained a detailed history of interactions with the uploaded photo, including the number of views, downloads, and shares the image receives.

g.  Photobucket also stored the licensing terms, as well as any usage rights assigned to the platform or third parties that Photobucket believed pertained to each uploaded photo at the time of the upload according to Photobucket's Terms of Use and whether the uploader designated the photo as "public" or "private."

13

h. On information and belief, Photobucket also stored records of any third-party reports or takedown requests associated with each image, including notifications regarding alleged copyright violations or other infringing activity.

i. In some instances, there were also watermarks containing copyright notices that the uploader had added to the image.

55. The popularity of Photobucket's services waxed and waned with the popularity of Myspace. In 2010, shortly after the peak of Myspace's popularity, Photobucket claimed that over four million images were being uploaded by its users every day.

56. In 2011, seeking to maintain relevance, Photobucket became the default photo sharing platform for Twitter, resulting in links to Photobucket users' content being shared more than two million times per day.

57. At its peak, Photobucket is reported to have hosted images for more than 100 million registered members, and its CEO has boasted that Photobook has amassed more than 13 billion images over its two-plus decades of existence.

58. As a primarily free service to its users, Photobucket generated its revenue from advertising; as such, the company derived its value from its popularity.

59. Over time, however, Photobucket's popularity waned as Myspace fell out of favor and social media sites such as Twitter began hosting their users' images directly on their platform, rather than relying on third-party hosting sites such as Photobucket.

**D.    The Evolution of Photobucket's Terms of Use**

60. When Photobucket launched the company in the early 2000s, it made a point of noting in its Terms of Use that it "respects the intellectual property rights of others." Accordingly,

14

it long recognized that its users, not Photobucket, owned the intellectual property associated with the photos they uploaded.

61.     Photobucket's Terms of Use evinced this recognition throughout the era in which it was most widely used. Starting in 2006, Photobucket's Terms of Use stated that users granted the company a license to "use, copy, modify, print, and display any User Content **only as necessary to perform the Services** and to distribute" content that a user designated or shared a link to.

62.     Then, in September 2011, after the vast majority of the content Photobucket hosts had already been uploaded to the site pursuant to the prior versions of the Terms of Use, and after most account holders had ceased engaging with the service, Photobucket amended the terms to state that when a user uploads content marked "public" they granted the company "a worldwide, non-exclusive, royalty-free, non-revocable, right and license to: copy, sell, convey, distribute, stream, post, publicly display (e.g. post it elsewhere), reproduce and create derivative works from it (meaning things based on it), whether in print or any kind of electronic version that exists now or is later developed, for any purpose, including a commercial purpose with the right to sublicense such rights to others."

63.     The vast majority of Photobucket users never saw this provision which is inconsistent with Photobucket's prior representations regarding users' intellectual property rights to their own pictures and its respect for these rights. Moreover, because the vast majority of users had ceased engaging with Photobucket's services the new provision did not become binding on them by the agreement's own terms.

64.     Photobucket attempted to circumvent the fact that users did not agree to provide it such a broad license by adding another provision to the Terms of Use in October 2012, which read: "These Terms and the Privacy Policy can change. Again, please carefully read this document and

15

our other policies. We may announce if any 'big' changes are made, but so long as you've used the Site after the change, regardless of any separate notice, you agree to the current posted version of the Terms."

65.    Of course, the vast majority of Photobucket's users never saw this provision either and, not having continued to engage with the service, it too did not become binding on them.

66.    In any event, Photobucket could not retroactively give itself a significantly greater license to the photos than it claimed at the time of their upload. Particularly not a license to put the photos to uses that were unforeseen at the time users uploaded their photos pursuant to the then-operative terms.

67.    Then, needing revenue, in 2017 Photobucket abruptly ended its free hosting service, and instead required users to pay a subscription fee initially set at $399/year.

68.    In a tactic that presages the conduct giving rise to this lawsuit, Photobucket did not just require new users to pay the subscription going forward, but also required any existing users to agree to pay the subscription price lest their photos be deleted or their accounts deactivated, which contravened its prior agreements. Effectively, Photobucket was extorting its users.

69.    Not surprisingly, the move was heavily criticized, and most of Photobucket's remaining active users abandoned it. By the end of 2018, Photobucket reportedly had only ten employees, down from 120 at its peak.

70.    Following the 2017 pricing fiasco, Photobucket seemingly began taking steps to regain consumer trust and rebuild its user base. It rescinded the subscription fee to access third-party image hosting and offered more reasonably priced subscription tiers.

16

71.    Also, as part of the campaign to repair its image, Photobucket adopted what it called a "Member Bill of Rights" in late 2018 or early 2019. Among other promises and assurances, the Bill of Rights stated:

> Photobucket will always make good-faith efforts to keep your photos secure. Photobucket understands that privacy and security will continue to be a growing concern. We will always make privacy options available to our customers and your specific privacy settings will not be adjusted by Photobucket without prior consent from you.

72.    Photobucket's CEO Ted Leonard touted the Member Bill of Rights, calling it "one of the most exciting and important things we've done for our Members and it's an industry first."

**E.    Photobucket Resorts to Tricks and Coercion to Obtain Consent to AI and Biometrics**

73.    By 2024, the vast majority of Photobucket's registered users had not accessed their account in years, but Photobucket still retained their photographs. Nonetheless, in May and June of 2024 Photobucket began an email campaign targeting these users.

74.    The emails appeared innocuous enough—some simply asked if the user wished to keep or delete their account, offering links to "Keep My Account" or "Delete My Account." Others provided notification that the account had been deactivated and provided a link to allow the user to "Reactivate My Account," "Unlock My Account," or "Reset My Password."

75.    To those receiving these emails, it appeared that Photobucket was again simply "cleaning up" its roster of users, and perhaps making another pitch for users to pay a subscription fee.

76.    In reality, Photobucket was now planning to sell the images to third parties, profiting from the biometric identifiers that could be extracted from its users' images. This round of emails was Photobucket's attempt to trick the users into engaging with the website.

17

77.     Contrary to their plain language, the emails were not intended to allow users to "reactivate," "unlock," or even "delete" their accounts. Instead, no matter which link the user clicked on, they were taken to a page where the user was forced to accept Photobucket's updated Terms of Use to proceed.

78.     To undertake any action with respect to their account—even to delete their account—users were also forced to agree to Photobucket's brand-new Biometric Information Privacy Policy (the "Biometric Policy"). The Biometric Policy revealed the real reason Photobucket was reaching out to its long-dormant user base: it was planning to sell their biometric information, and it was trying (ineffectively, as described below) to obtain users' consent to do so.

**F.     Photobucket's Biometric Policy Reveals that it Licenses Plaintiff's and Class Members' Biometric Face Geometry Without Informed Written Consent**

79.     Since at least 2023, Photobucket has been aware of BIPA and other similar laws enacted to protect consumers' biometric data.

80.     Photobucket's new Biometric Policy shows that Photobucket is aware of these laws that protect consumers' biometric data, but the Policy falls woefully short of obtaining the informed written consent required by BIPA or other laws.

81.     The Biometric Policy, in garbled in syntax, states: "By agreeing to our use of your Biometric Information you grant Photobucket, to the extent permitted by the laws of your region, commercialize [sic], including the right to license your Public User Uploaded Content to third parties for the scanning and processing of the Public User Uploaded Content, including extracting physical features, e.g. measurements, of your Biometric Information (e.g., face, iris, etc.), for the purpose of artificial intelligence and machine learning training and the subsequent uses derived therefrom."

82.    Other provisions of the Biometric Policy also demonstrate Photobucket's awareness of laws, such as BIPA, that protect consumer's biometric data.

83.    For example, the Biometric Policy explicitly carves out different rules for residents of several states, including California, Illinois, and Virginia: "Public User Uploaded Content from residents of California, Colorado, Connecticut, Florida, Illinois, Montana, Oregon, Texas, Utah, Virginia, Washington, and the European Union will not knowingly be sold, leased, traded, or otherwise profited from even if a user agrees to its sale, lease, trade, or otherwise profit from the disclosure of their Public User Uploaded Content."

84.    New York is curiously and conspicuously absent from this list.

85.    Despite this seemingly clear exclusion for California, Illinois, and Virginia residents (among others), in the very next sentence the Biometric Policy makes clear that Photobucket will take no efforts to discern the residency of its users before selling their biometric information. "Out of respect for your privacy, Photobucket limits the amount of geolocation information it possesses; therefore, if you have become a resident of one of these states since you last signed up for your Photobucket account, or if you want to confirm your state residency with us, please contact us at support@photobucket.com or update your user profile once logged into your Account."

86.    In other words, Photobucket knows that it possesses pictures of residents of states that prohibit its planned us of their data. But, rather than limit its plan to those accounts where it can confirm current residency (or, better yet, not licensing any of the photos for onerous uses), Photobucket is playing the ostrich and leveraging its own ignorance.

19

87.     Proceeding to license the photos of Illinois residents for biometrics under these circumstances is, at best, a reckless violation of BIPA's statutory protections, and a reasonable jury could find that it is a knowing violation of the statute.

88.     Similarly, under these circumstances a jury could find that Photobucket's failure to sort out California and Virginia residents constitutes violation of those states' biometrics laws.

89.     Likewise, a jury could easily determine that Photobucket's failure to even acknowledge New York's biometrics protections, much less take actions to comply with such laws, constitutes a violation of New York law.

90.     Photobucket does not even purport to obtain informed written consent, as the law requires, given that the vast majority of users haven't engaged with its website in over a decade. Rather, the Biometric Policy states that the prior users (who do not even know of the Policy's existence and who have never agreed to be bound by their silence) are deemed to consent if they do not send notice of their disagreement within 45 days of its July 22, 2024 "Effective Date": "There is an initial opt-out period of forty-five (45) days from the Effective Date listed above ('Initial Opt-Out Period'). During the Initial Opt-Out Period, you can opt-out before any license or sale takes effect."

91.     If a user, such as Plaintiffs, did not opt out of the Biometric Policy within this 45-day period, then Photobucket claims the right to sell, lease, trade, or otherwise profit from that user's biometric information, all of which is contrary to the law.

92.     A user can still opt out even after the conclusion of the initial 45-day period. However, doing so only triggers Photobucket's promise that the user's biometric information "will not be further sold, leased, traded, or otherwise profited from after the date we receive and process" the opt-out request. The Biometric Policy explicitly foreswears any promise that biometric

information already sold to a third party will—or even can—be recalled following an opt-out: "If you do not opt out during the Initial Opt-Out Period and we do provide your Public User Uploaded Content to a third party, we cannot guarantee we can recall it[.]"

### G.    Facts Specific to Plaintiffs

93.    Plaintiff Pierce became a registered user of Photobucket in or around 2011, when he was a minor residing in Idaho. He used Photobucket to store images, including images of his face, and posted links to his Photobucket-stored images on his MySpace page.

94.    As MySpace's popularity declined, so, too, did Mr. Pierce's need for Photobucket. To his best recollection, the last time he logged into his Photobucket account (prior to responding to Photobucket's 2024 emails as described herein) was approximately 2014.

95.    At that time, as described above, the Photobucket Terms of Use provided that any amendments would become effective as to Mr. Pierce only if he thereafter logged on and interacted with the platform, which he did not do.

96.    In 2021, Mr. Pierce relocated to Chicago, Illinois and he has remained an Illinois resident ever since and presently intends to continue.

97.    In May and June of 2024, Photobucket sent Mr. Pierce several emails, such as those described above, informing him that his account "has been deactivated" and purportedly offering the opportunity to "reactivate," "unlock," or "delete" his account. These emails were sent on May 15, June 1, and June 7, 2024. None of these emails mentioned the Biometric Policy or indicated that account access depended upon Mr. Pierce's agreeing to the Biometric Policy. Mr. Pierce did not respond to any of the May/June 2024 emails. He did not click on any of the links provided in those emails, nor did he agree to the updated Terms of Use or the new Biometric Policy described above.

21

98.     Notwithstanding the fact that Mr. Pierce had not consented to anything, much less the sale of his biometric face geometry to be used by unknown third parties for machine learning purposes, on or after September 3, 2024—after the expiration of the 45-day "opt out" period—Photobucket apparently licensed his images to the third-party Unknown Defendants for the use of his biometric data as described herein.

99.     Photobucket has confirmed in writing that it is actively marketing Mr. Pierce's images for sale for biometric purposes as explained below.

100.    In September, October, and November of 2024, Photobucket sent Mr. Pierce several more emails, such as those described above, again purportedly offering the opportunity to "recover" his account or his old photos. These emails were sent on September 13, 16, 22, 25, and 28, 2024; October 17, 23, and 29, 2024; and November 1, 4, and 7, 2024. Again, none of these emails mentioned the Biometric Policy or indicated that account access depended upon Mr. Pierce agreeing to the Biometric Policy.

101.    Notably, even though Photobucket was already actively seeking to license and/or sell Mr. Pierce's images for biometric purposes, the September–November emails described Mr. Pierce's account as locked "[f]or your protection" or "for your security" and indicated that "Photobucket has been safeguarding your photos hoping you would return."

102.    Mr. Pierce did not respond to any of the September–November 2024 emails or click on any of the links provided in those emails, except the November 7, 2024 email discussed below. He did not agree to the updated Terms of Use or the new Biometric Policy described above.

103.    On November 7, 2024, Mr. Pierce responded to one of the numerous emails he had received from Photobucket containing a link to "recover his account." When Mr. Pierce clicked on

the link, he was advised that he had to agree to the updated Terms of Use and new Biometric Policy to proceed with the "recovery."

104.    Mr. Pierce became alarmed and contacted Photobucket's customer service. He asked whether his photos had already been used for biometrics.

105.    Photobucket confirmed that Mr. Pierce's face geometry may in fact have already been sold to unknown third parties for "artificial intelligence and machine learning training," and—even worse—that Photobucket cannot retrieve his data after it has been shared.

106.    The email Photobucket sent to Mr. Pierce is reproduced accurately as follows:

---

**Re: Accessing photos without biometric consent given**

**From** Photobucket Support <support@photobucket.com>

**Date** Thu 11/7/2024 2:03 PM

**To**    Mac Pierce <████████████

\*\*## Please do not write below this line ##\*\*

---

**Alastair** (Photobucket Support)
Nov 7, 2024, 1:03 PM MST

Hi Marc,

Thanks for your reply!

Your account was automatically opted-in after the 45-day opt-out period, so some of your account contents may have been made available to third parties, for the express purposes of artificial intelligence and machine learning training. I apologize that we cannot retrieve any Public data that may have been previously shared for this purpose.

Let me know if you have questions or need additional assistance!

Best,

Alastair@Photobucket Support

23

107.    Even after his interaction with customer service, Mr. Pierce has continued to receive similar emails from Photobucket throughout 2025, including multiple emails in which Photobucket represented that it was continuing to "safeguard" his photos.

108.    Plaintiff Niki Hughes opened an account on Photobucket while residing in Illinois around the same time as Plaintiff Pierce.

109.    Mrs. Hughes uploaded photos of her husband, Plaintiff Sean Hughes and their minor child, among other photos.

110.    Mr. Hughes never created a Photobucket account.

111.    Mr. Hughes never agreed to any of Photobucket's Terms of Use.

112.    Plaintiff Valerie Cumming is a resident of Iowa who created and used a Photobucket account in the early 2000s.

113.    Ms. Cumming uploaded photos of herself and friends to Photobucket.

114.    Ms. Cumming last logged into Photobucket around 2010.

115.    Ms. Cumming has received numerous emails in recent months from Photobucket indicating that it still has her photos stored on its servers.

**CLASS ACTION ALLEGATIONS**

116.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following two Classes:

117.    Photobucket User Class: All persons who uploaded photographs to Photobucket at any time from January 1, 2003 until May 1, 2024.

118.    Photographed Class:  All persons who appear in photographs uploaded to Photobucket at any time but did not themselves create a Photobucket account.

24

119.    The Photobucket User Class brings claims under federal copyright laws, as well as statutory claims for biometric and other privacy torts, and common law claims for breach of contract (Photobucket's Terms of Use), unjust enrichment and conversion.

120.    The Photographed Class brings statutory and common law claims for biometric and other privacy torts, violation of publicity rights and unjust enrichment.  The Photographed Class, which includes friends, family members, and privies of the Photobucket User Class, also brings claims for breach of the user agreement as third-party beneficiaries.

121.    Excluded from the Class are: (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

122.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the prerequisites of Rule 23 of the Federal Rules of Civil Procedure.

123.    <u>Ascertainability</u>: The Class can be readily identified through Defendants' records and public databases.

124.    <u>Numerosity</u>: The Class is sufficiently numerous such that individual joinder of all Class members is impracticable. Photobucket has over 100 million customers, a substantial portion of whom reside in the United States.

125.    <u>Commonality and Predominance</u>: This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

        a.    Whether Defendants engaged in the wrongful conduct alleged herein;

        b.    Whether the actions of Defendants violate statutory and common law;

25

c.    Whether Defendants have used or are threatening to use photos belonging to the members of Photobucket User Class in a manner that violates their copyrights.

d.    Whether Defendants have used or are threatening to use photos depicting the members of Class in a manner that violates their privacy rights or publicity rights.

e.    Whether Photobucket sold, licensed, traded or otherwise profited from the biometric identifiers or biometric information belonging to Class members, such as by selling, licensing, or trading such data to the Unknown Defendants.

f.    Whether Photobucket disclosed biometric identifiers or biometric information belonging to Class members to third parties, including the Unknown Defendants.

g.    Whether Photobucket obtained informed written consent from the Plaintiff Class before disclosing the Class members' biometric identifiers or biometric information to third-parties, including the Unknown Defendants;

h.    Whether the Unknown Defendants received the informed written consent of Class members prior to purchasing, leasing, or otherwise seeking to obtain from Photobucket the Class members' biometric identifiers or biometric information;

i.    Whether Photobucket sent emails to Class members in June 2024 prompting them to keep, delete, reactivate, unlock, reset, or otherwise update their account for the deceptive purpose of obtaining Class members' consent to the Biometric Policy;

j.    Whether Photobucket or the Unknown Defendants removed or altered copyright management information from its photos;

k.    Whether Photobucket distributed copyright management information that it knew had been removed or altered and that it had reasonable grounds to believe would induce, enable, facilitate, or conceal copyright infringement;

l.    Whether Defendants' conduct was and is willful, reckless, or negligent;

m.    The appropriate measure of damages to award Plaintiffs and the other Class members; and

n.    The appropriate injunctive relief to which Plaintiffs and the other Class members are entitled.

126.  <u>Typicality</u>: Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and each of the other Class members were users of Photobucket and/or depicted in photos uploaded to Photobucket, and Photobucket is making the same uses and threatened uses of their photos.

127.  <u>Adequacy of Representation</u> (Fed. R. Civ. P. 23(a)(4)): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and other privacy litigation (including successfully litigating class action cases similar to this one, where the defendants breached statutory privacy obligations and copyright laws), and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

128.  <u>Declaratory and Injunctive Relief</u> (Fed. R. Civ. P. 23(b)(2)): Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

129.  <u>Superiority</u> (Fed. R. Civ. P. 23(b)(3)): A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

**FIRST CAUSE OF ACTION**

**Violation of State Privacy Law Including 740 ILCS 14/10 (b, c, d & e) (BIPA), Va. Code
§ 8.01-40(A), Va. Code § 18.2-152.1, et seq., Cal. Civ. Code § 1798.100(b) via Cal. Bus. &
Prof. Code § 17200, Cal. Civ. Code § 3344(a), New York Civil Rights Law §§ 50–51, Tex.
Bus. & Com. Code Ann. § 503.001, Wash. Rev. Code § 19.375.010 et seq., 9 Vt. Stat. Ann.
2430 et seq, and State Common Law Privacy and Publicity Protections
Nationwide Photobucket User Class Against Photobucket
(Failure to obtain informed consent from Photobucket users prior to capturing, collecting,
storing, licensing, and using biometric information)**

130.    Plaintiffs Pierce, Niki Hughes and Cumming reassert, reallege, and incorporate by
reference all of the paragraphs of this Complaint.

131.    Plaintiffs bring this claim individually and on behalf of all other Photobucket User
Class Members.

132.    Photobucket's Biometric Policy purports to give Photobucket "the right to license
your Public User Uploaded Content to third parties for the scanning and processing of the Public
User Uploaded Content, including extracting physical features, e.g. measurements, of your
Biometric Information (e.g., face, iris, etc.)."

133.    Photobucket's Biometric Policy also purported to give Class Members a 45-day
period in which they could opt-out of the Biometric Policy. If a user, such as the User Class
Plaintiffs, did not opt out of the Biometric Policy within this 45-day period, then the Biometric
Policy purported to give Photobucket the right to sell, lease, trade, or otherwise profit from that
user's biometric information.

134.    Members of the Photobucket User Class, including Mr. Pierce and Mrs. Hughes,
never agreed to the Biometric Policy. Photobucket User Class Members' silence following
Photobucket's imposed 45-day opt-out period does not provide consent from inaction and does not
constitute informed, written consent as required by various states' laws.

28

135.    Moreover, even if failing to opt-out during the 45-day window was sufficient evidence of consent—which it is not—the Biometric Policy grants Photobucket only a general right to sell, license, or disclose biometric identifiers or biometric information and does not constitute notice that such biometric data *is* being used, or the specific purpose and duration of such use as required by, BIPA, 740 ILCS 14/15(b), and other state law privacy protections.

136.    Photobucket knew that members of Photobucket User Class never validly agreed to the Biometric Policy.

137.    Nevertheless, based on its communications with Plaintiff Pierce, Photobucket treated members of Photobucket User Class as if they had agreed to the Biometric Policy and appears to have begun to sell, lease, or otherwise disclose data belonging to the members of the Photobucket User Class to third parties for purposes of extracting biometric identifiers and/or biometric information.

138.    As alleged above, Defendant Photobucket violated state privacy protections by failing to inform in writing and obtain written releases from Photobucket User Class Members prior to capturing, collecting, storing, licensing, distributing, and commercially using their biometric identifiers and/or biometric information.

139.    Photobucket knew that various state laws and statutes, including BIPA, protect the biometric identifiers and/or biometric information of residents of these states.

140.    Photobucket also knew that many of its users, like Mr. Pierce, had either never identified their state of residence or had changed their state of residence since creating an account during the period of Photobucket's growth and popularity more than a decade ago.

141.    As a consequence, as a website that, at its peak, attracted millions of users from all over the world, Photobucket knew that many of its users and former users now reside in Illinois

and other states with statutory biometric protections. Nevertheless, beyond referring to its own inadequate and outdated internal data, Photobucket took no steps to identify users residing in California, Illinois, New York, Virginia, and other states who are protected by the privacy laws of their states.

142.    As such, these violations by Photobucket alleged herein were knowing, intentional and reckless, or, pleaded in the alternative, negligent.

143.    As a direct and proximate result of the Photobucket's violations, Plaintiffs and Photobucket User Class Members have suffered and will continue to suffer injury.

144.    Plaintiffs and Photobucket User Class Members seek monetary relief as applicable under the relevant state law.

145.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Photobucket will continue to cause great and irreparable injury to Mr. Pierce, Mrs. Hughes, Ms. Cumming, and members of the Photobucket User Class in that their biometric identifiers and information can be viewed and used by unauthorized persons. Mr. Pierce, Mrs. Hughes, Ms. Cumming and Class Members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the misuse of their biometric identifiers and information.

146.    Plaintiffs and members of the Photobucket Users Class also seek punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

### SECOND CAUSE OF ACTION

**Violation of State Privacy Law Including 740 ILCS 14/10 (b, c, d & e) (BIPA), Va. Code
§ 8.01-40(A), Va. Code § 18.2-152.1, et seq., Cal. Civ. Code § 1798.100(b) via Cal. Bus. &
Prof. Code § 17200, Cal. Civ. Code § 3344(a), New York Civil Rights Law §§ 50–51, Tex.
Bus. & Com. Code Ann. § 503.001, Wash. Rev. Code § 19.375.010 et seq., 9 Vt. Stat. Ann.
2430 et seq, and State Common Law and Constitutional Privacy and Publicity Protections
Nationwide Photobucket User Class Against Photobucket**
**(Capturing, collecting, storing, licensing, using and profiting from biometric information
without informed consent of those appearing in photographs)**

147.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the

complaint.

148.    Plaintiffs bring this claim individually and on behalf of all other Photographed

Class Members.

149.    As alleged above, members of the Photographed Class, including Mr. Hughes,

never agreed to the Biometric Policy.

150.    Many members of the Photographed Class never even created accounts on

Photobucket or consented to any version of Photobucket's Terms of Use. Instead, members of the

Class such as Mr. Hughes simply appear in photos, including pictures of their faces, that other

people uploaded to Photobucket.

151.    Photobucket knew that members of the Photographed Class never agreed to the

Biometric Policy or otherwise consented to the use of their biometric data.

152.    Nevertheless, Photobucket has and is threatening to continue to sell, lease,

otherwise disclose, and use biometric identifiers of the Photographed Class Members.

153.    Photobucket violated state law by failing to obtain consent from the Photographed

Class Members prior to selling, licensing, otherwise disclosing, or using their biometric identifiers

and/or biometric information.

154.    Photobucket knew that state law protects the biometric identifiers and/or biometric information of residents of many states.

155.    As a website that, at its peak, attracted millions of users from all over the world, Photobucket knew that many people appearing in photos hosted on its site live in states like Illinois with robust biometric privacy regimes. Nevertheless, Photobucket proceeded with its plan to use and profit from Class Members' protected biometric data notwithstanding the lack of consent from members of the Photographed Class with whom Photobucket has no relationship at all and who live in states where their biometric data is protected.

156.    As such, the violations by Photobucket alleged herein were intentional and reckless, or, pleaded in the alternative, negligent.

157.    As a direct and proximate result of the Photobucket's violations, Plaintiffs and members of the Photographed Class have suffered and will continue to suffer injury.

158.    Mr. Pierce, Mrs. Hughes, Mr. Hughes, Ms. Cumming, and members of the Photographed Class seek as monetary relief the greater of actual damages or statutory damages.

159.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Photobucket will continue to cause great and irreparable injury to Plaintiffs and members of the Photographed Class in that their biometric identifiers and information will continue to be subject to unknown uses by unknown third parties. Plaintiffs and the Photographed Class have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the misuse of their biometric identifiers and information.

160.    Plaintiffs and Members of the Photographed Class also seek punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

**THIRD CAUSE OF ACTION**

**Violation of State Privacy Law Including 740 ILCS 14/10 (b, c, d & e) (BIPA), Va. Code § 8.01-40(A), Va. Code § 18.2-152.1, et seq., Cal. Civ. Code § 1798.100(b) via Cal. Bus. & Prof. Code § 17200, Cal. Civ. Code § 3344(a), New York Civil Rights Law §§ 50–51, Tex. Bus. & Com. Code Ann. § 503.001, Wash. Rev. Code § 19.375.010 et seq., 9 Vt. Stat. Ann. 2430 et seq, and State Common Law Privacy and Publicity Protections
Nationwide Class Against Unknown Defendants
(Capturing, obtaining, storing, licensing, using and profiting from biometric information without informed consent of those appearing in photographs)**

161.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

162.    Plaintiffs bring this claim individually and on behalf of all the Photobucket User and Photographed Class Members.

163.    The Unnamed Defendants purchased, leased, licensed, or otherwise obtained biometric identifiers and biometric information from Photobucket, and/or extracted such data from photographs licensed to them by Photobucket and therefore currently have access to Photographed Class Members' biometric data.

164.    At no time before or after the acquisition of the Class Members' biometric identifiers and biometric information have any of the Unnamed Defendants provided written notice to any of the Photographed Class Members of the planned or completed collection and storage of their biometric identifiers.

165.    At no time before or after the acquisition of the Class Members' biometric identifiers and biometric information have any of the Unnamed Defendants provided written information to Class Members regarding the specific purpose and length of term for which their data is being collected, stored, and used.

166.    At no time before or after the acquisition of the Class Members' biometric identifiers and biometric information have any of the Unnamed Defendants solicited or obtained

informed written consent allowing the Unnamed Defendants to collect, store, and use the Class Members' biometric information.

167.    The Unnamed Defendants therefore violated state law by failing to inform in writing and obtain written releases from Class Members prior to capturing, collecting, or storing their biometric identifiers and/or biometric information.

168.    The Unnamed Defendants knew or should have known that many of the photographs licensed to them by Photobucket contain pictures of individuals who did not—and could not have—given Photobucket consent to so license their biometric data.

169.    The privacy law violations by the Unnamed Defendants alleged herein were intentional and reckless, or, pleaded in the alternative, negligent.

170.    As a direct and proximate result of the Unnamed Defendants' privacy violations, Plaintiffs and Photographed Class Members have suffered and will continue to suffer injury.

171.    Plaintiffs and Photographed Class Members seek as monetary relief the greater of actual or statutory damages.

172.    Unless and until enjoined and restrained by order of this Court, the wrongful conduct of Unknown Defendants will continue to cause great and irreparable injury to Plaintiffs and Photographed Class Members in that their biometric identifiers and information can be viewed and used by unauthorized persons for unknown reasons. Plaintiffs and Photographed Class Members have no adequate remedy at law for their injuries in that a judgment for monetary damages will not end the misuse of their biometric identifiers and information.

173.    Plaintiffs and Photographed Class Members also seek punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

## FOURTH CAUSE OF ACTION

**Violation of State Deceptive Practices Law Including C.R.S. 6-1-113, 815 ILCS 505/2, Iowa
Code § 714H.3, Va. Code 59.1-200, Cal. Bus. & Prof. Code § 17500, NY Gen. Bus. Law §
349, and other State UDAP Statutes**
**Photobucket User Class Against Defendant Photobucket**
**(Misleading and deceptive acts, practices, and omissions)**

174.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the

complaint.

175.    Plaintiffs bring this claim individually and on behalf of all other Photobucket User

Class members.

176.    The law of every state prohibits deceptive or misleading business acts or practices.

177.    In May and June of 2024, Photobucket sent the Photobucket User Class Members

several emails, such as those described above, informing them at their accounts had been

"deactivated" and purportedly offering the opportunity to "reactivate," "unlock," or "delete" their

accounts.

178.    In these May and June 2024 emails, Photobucket omitted and concealed the

material facts that:

a.    Photobucket intended to imminently implement the Biometric Policy.

b.    Future account access depended upon agreeing to the Biometric Policy.

c.    Photobucket would disclose the Photobucket User Class Members'
biometric data to the Unknown Defendants if Class Members did not
affirmatively opt-out within 45-days of the Biometric Policy's July 22, 2024
Effective Date—even though Photobucket had represented that Class
Members' accounts had been deactivated.

d.    Photobucket would begin such disclosures after the conclusion of the 45-
day window whether or not the Photobucket User Class Members ever even

35

agreed to the Biometric Policy—even though Photobucket had represented that Class Members' accounts had been deactivated.

179.     Photobucket omitted and concealed such material facts with the intent that its users would rely on the May and June 2024 emails to either (1) visit Photobucket's website and agree to the Biometric Policy in order to regain access to their account and view their old photos; or (2) believing their accounts to be deactivated, not visit Photobucket's website and thus allow Photobucket to access their biometric data at the conclusion of the hidden 45-day opt-out clock. In other words, Photobucket withheld key information in order to coerce its users into agreeing to the Biometric Policy or cause them to be completely unaware of their ability to opt-out.

180.     On or after September 3, 2024—following the expiration of the 45-day "opt out" period—Photobucket began licensing the images of Mr. Pierce, Mrs. Hughes, Ms. Cumming, and other Photobucket User Class Members to the third-party Unknown Defendants for the use of their biometric identifiers and information.

181.     At the same time, Photobucket sent numerous emails to Mr. Pierce, Mrs. Hughes, Ms. Cumming, and other Photobucket User Class Members in September, October, and November of 2024 that described their accounts as locked "[f]or your protection" or "for your security" and indicated that "Photobucket has been safeguarding your photos hoping you would return."

182.     In these September–November 2024 emails, Photobucket omitted and concealed the material fact that it was actively seeking to profit off the photos of Mr. Pierce, Mrs. Hughes, Ms. Cumming, and other Photobucket User Class Members by selling and/or licensing them for purposes of extracting and using the Photobucket User Class Members' biometric identifiers and biometric information without their consent.

36

183.    Photobucket's use of language that it had "safeguarded" the photos of Mr. Pierce, Mrs. Hughes, Ms. Cumming, and other Photobucket User Class Members or acted in the interests of their "protection" or "security" was deceptive in that such language indicated that the Subclass Members' photographs and data—including biometric data—was not being illegally used or disclosed without informed consent.

184.    Again, Photobucket omitted material facts and made deceptive statements in its September–November 2024 emails with the intent that its users would rely on these emails to either (1) visit Photobucket's website and agree to the Biometric Policy in order to regain access to their account and view their old photos; or (2) not visit Photobucket's website and thus allow Photobucket to continue accessing their biometric data without their consent (the hidden 45-day opt-out clock having expired). In other words, Photobucket continued to withhold key information in order to coerce its users into agreeing to the Biometric Policy or cause them to be completely unaware of their ability to opt-out.

185.    Because of Photobucket's deceptive acts and omissions of material fact, Photobucket User Class Members—to the extent they have even discovered that Photobucket is extracting and distributing their biometric identifiers and biometric information—have only learned of Photobucket's conduct long after the date that Photobucket began selling, licensing, and/or otherwise disclosing Class Members' biometric data to third parties.

186.    As a direct and proximate result of Photobucket's deceptive acts and omissions of material fact, Photobucket User Class Members have suffered and will continue to suffer injury in that Class Members were (1) denied the opportunity to refuse consent prior to the disclosure and use of the biometric identifiers and information, and (2) denied the opportunity to derive economic benefit from the sale of their biometric information.

37

187.    Mr. Pierce, Mrs. Hughes, Ms. Cumming, and Photobucket User Class Members seek compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and expenses relating to this action.

**FIFTH CAUSE OF ACTION**
**Breach of Contract**
**Nationwide Photobucket User Class Against Defendant Photobucket**

188.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

189.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

190.    By agreeing to Photobucket's Terms of Use then in force at the times that they created their Photobucket accounts, Plaintiffs Pierce, Mrs. Hughes, Cumming, and other Photobucket User Class Members entered into valid and enforceable contracts with Photobucket governed by those Terms of Use.

191.    Although Photobucket's Terms of Use underwent change and revision over time, from approximately 2006 onward the Photobucket User Class Members consistently granted Photobucket a license to copy, distribute, publicly display, reproduce and create derivative works from the public user content (regardless of the time period applicable to individual class members).

192.    The new Biometric Policy and Terms of Use, adopted in July 2024, attempted to make a drastic and unilateral change to the scope of the license users granted to Photobucket to use their data.

193.    Until Photobucket published the July 2024 Terms of Use and Biometric Policy, no previous version of the Terms of Use ever granted Photobucket permission to extract, store, license, use, sell, lease, trade, or otherwise distribute users' biometric information or data.

194.    Photobucket could not, and was aware that it could not, treat its users as having agreed, under any previous version of the Terms of Use, to give it the right to extract, store, or license their data to train artificial intelligence absent their affirmative and informed consent.

195.    Photobucket could not make any other material changes to its Terms of Use operative, including any arbitration requirements, without each Plaintiff or Class Members' affirmative and informed consent.

196.    None of the Plaintiffs provided Photobucket with affirmative, informed consent to any changes to its Terms of Use made in the last decade—at least.

197.    The vast majority of Photobucket User Class Members have also not provided Photobucket with affirmative, informed consent to any changes made to its Terms of Use since prior to September 2011.

198.    Photobucket attempted to exploit the near-total information asymmetry between Photobucket and Class Members to prevent Class Members from learning how to avoid disclosure of sensitive and deeply personal biometric data or how to retrieve their photographs without agreeing to the Biometric Policy.

199.    Accordingly, any use or distribution of biometric data extracted from Plaintiffs' or Photobucket User Class Members' photos constitutes a breach of Photobucket's Terms of Use. Likewise it breaches the terms of use for Photobucket to license the photos for these purposes.

200.    Furthermore, Photobucket is in anticipatory breach because, as its statements to Plaintiff Pierce show, the company has already begun and intends to continue distributing photos for use in training artificial intelligence.

201.    Furthermore, Photobucket's statements in the press and in email communications with users regarding its imminent plans to license users' data for artificial intelligence model training show the same intent and plan.

202.    As a direct and proximate result of Photobucket's actions, Class Members have suffered and will continue to suffer injury in that Class Members were (1) denied a meaningful opportunity to prevent the misuses of their biometrics and (2) denied the opportunity to derive economic benefit from the sale of this data.

203.    Ms. Cumming,  Mrs. Hughes, and Mr. Pierce, and Photobucket User Class Members seek declaratory and injunctive relief as well as compensatory and punitive damages, and reasonable attorney's fees, costs, and expenses relating to Photobucket's breach of contract.

### SIXTH CAUSE OF ACTION
**Conversion**
**Nationwide Photobucket User Class Against Unknown Defendants**

204.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

205.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

206.    Photobucket never had Plaintiffs' or Class Members' consent to transfer or license the data stored in their photos to anyone else for use in training artificial intelligence models.

207.    Defendants knew or should have known that Photobucket did not have a right to transfer Plaintiffs' and Class Members' digital property to them.

208.    On information and belief, Unknown Defendants have accepted and used Plaintiffs' and Class Members' photos for training artificial intelligence models

209.    In the alternative, Unknown Defendants imminently plan to take possession of Plaintiffs' and Class Members' photos and use them for training artificial intelligence models.

40

210.    Mr. Pierce, Mrs. Hughes and Photobucket User Class Members seek declaratory and injunctive relief as well as compensatory and punitive damages, and reasonable attorney's fees, costs, and expenses relating to Unknown Defendants' conversion of their photos.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### All Classes Against Photobucket

211.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

212.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

213.    Photobucket has provided an online image storage service to Class Members for more than a decade.

214.    The Terms of Use of Photobucket's core image storage service have long given Photobucket a license to use images marked "public" on its platform as necessary for the services Photobucket agreed to provide its users—but not to extract, sell, license, or otherwise disclose sensitive biometric identifiers or biometric information obtained Class Members' pictures without informed written consent.

215.    As alleged herein, Photobucket has extracted, sold, licensed, or otherwise disclosed Class Members' biometric data to the Unknown Defendants without first obtaining informed written consent from Class Members.

216.    Photobucket profited from this wrongful alienation of Class Members' biometric data without their consent.

217.    As a direct and proximate result of Photobucket's misconduct, Class Members lost the opportunity to decide for themselves whether and how to monetize the sensitive biometric data

contained in the photographs stored on Photobucket, and Class Members did not receive any share of the proceeds of the sale of their biometric data.

218.    Absent any adequate remedy at law, Mr. Pierce and Class Members seek restitution of the benefit unjustly conferred upon Photobucket by extracting, selling, licensing, or otherwise disclosing Class Members' biometric data without their consent.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**All Classes against Unknown Defendants**

219.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

220.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

221.    As alleged above, the Unknown Defendants are making unauthorized use of Class Members' biometric data for unknown purposes related to the training of artificial intelligence models.

222.    The Unknown Defendants derive revenue from their AI models—profit fueled, in part, by the use of Class Members' biometric identifiers and biometric information without Class Members' informed written consent.

223.    Although Class Members' have never consented to Unknown Defendants' use of their biometric data and continue to maintain their rights in such data, no portion of the revenues generated from the use of their biometric identifiers or biometric information has been remitted to Class Members.

224.    As a direct and proximate result of the Unknown Defendants' misconduct, Mr. Pierce, Mrs. Hughes, Mr. Hughes, Ms. Cumming, and Class Members have lost and continue to

lose the economic value of the biometric identifiers and information contained in their Photobucket photographs.

225.    Absent any adequate remedy at law, Mr. Pierce, Mrs. Hughes, Mr. Hughes, Ms. Cumming, and Class Members seek restitution of the benefits unjustly conferred upon the Unknown Defendants by storing, collecting, and using Class Members' biometric data to generate revenue without their consent.

**NINTH CAUSE OF ACTION**
**Civil Conspiracy**
**All Classes Against All Defendants**

226.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

227.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

228.    As alleged above, Photobucket has contractual arrangements to sell, license, or otherwise disclose Class Members' biometric identifiers and biometric information to the Unknown Defendants so that the Unknown Defendants may use such biometric data for their own commercial purposes.

229.    Both Photobucket and the Unknown Defendants have knowledge that the biometric identifiers and biometric information of Class Members is protected by statutory and common law. Yet, as alleged above, neither Photobucket nor the Unknown Defendants have obtained the informed consent required by to legally collect, capture, purchase, receive through trade, or otherwise obtain Class Members' biometric data.

230.    Each such contractual arrangement is an agreement between two or more persons or entities, for the purpose of using Class Members' sensitive biometric data for commercial

purposes without Class Members' consent, in furtherance of which Photobucket and the Unknown

Defendants each knowingly and willfully violated state statutory and common law.

231.    As a direct and proximate result of the conspiracy between Photobucket and the

Unknown Defendants, Mr. Pierce, Mrs. Hughes, Mr. Hughes, Ms. Cumming, and Class Members

have suffered and will continue to suffer injury in that their biometric identifiers and information

can be viewed, used, and monetized by unauthorized persons.

232.    Mr. Pierce, Mrs. Hughes, Mr. Hughes, Ms. Cumming, and Class Members seek

compensatory and punitive damages, injunctive relief, and reasonable attorney's fees, costs, and

expenses relating to this action.

### TENTH CAUSE OF ACTION
**Violation of 17 U.S.C. § 1202(b)(1) by Defendants**
**Photobucket User Class Against All Defendants**

233.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the

complaint.

234.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

235.    Plaintiffs are the owners of copyrighted photos that are stored on Photobucket's

servers.

236.    Photobucket's Terms of Use give Photobucket a license to use images marked

"public" on its platform as necessary for the services Photobucket agreed to provide its users but

not to extract, sell, or license those photos to Unknown Defendants for the completely

unforeseeable purpose of reproducing those copyrighted images through generative artificial

intelligence.

237.    Defendants have reason to know and actually do know that the use of photos to

train artificial intelligence infringes on users' copyright.

44

238.    Photobucket has publicly stated that it is in negotiations with various artificial intelligence companies to license its datasets, and it has conducted internal legal diligence regarding the copyright implications of such an arrangement.

239.    Unknown Defendants, artificial intelligence companies, are also well-aware of the potential for their products to infringe on the intellectual property of the owners of the data on which they are trained. There have been numerous high-profile lawsuits filed against these companies in the past few years putting them on actual notice of this potential.

240.    Defendants also have reason to know and actually do know that they are violating the law by removing or altering copyright management information associated with the photos on which their models are trained, including but not limited to metadata and accompanying text stating the title of the photo, photographer's name, the date of publication, any registered copyrights associated with the photo, and any limitations on its use.

241.    Defendants had reason to know that the removal of author, title, copyright notice, terms of use, and other information from copyright-protected photos and their use in training generative artificial intelligence models would result in those models providing responses to users that incorporated or regurgitated material verbatim from copyrighted works in creating responses to users, without revealing that those works were subject to Plaintiffs' and Class Members copyrights.

242.    A federal district court in the Southern District of New York recently allowed a lawsuit against several of the largest generative artificial intelligence companies to proceed based on the plaintiffs' allegations that generative artificial intelligence models were trained in a way that involved the intentional removal of copyright management information from model training

data. This too put the industry on notice that the altering or removal of copyright management information from model training data is unlawful.

243.    Nevertheless, on information and belief, Photobucket and the Unknown Defendants have or are imminently forming contractual arrangements to sell, license, or otherwise use Plaintiffs' and Class Members' copyrighted photos with altered or removed copyright management information.

244.    On information and belief, this training will involve the creation of copies of Plaintiffs' and Class Members' copyrighted photos without copyright management information including the author name; terms and conditions for the use of the photos; and the title, date, and other information identifying the photos or their copyright owner.

245.    On information and belief, the models that are trained on these copyright-management-information-stripped photos are likely to regurgitate the photos or parts of the photos without their associated copyright management information.

246.    The Defendants have reason to know that inclusion of these photos without their associated copyright management information will enable, facilitate, or conceal copyright infringement by the Defendants and the users of the Defendants' products.

247.    Mr. Pierce, Mrs. Hughes, Ms. Cumming and Photobucket User Class Members seek statutory damages or the total of the Class's damages and Defendants' profits to be elected by Plaintiffs, as well as declaratory and injunctive relief, and reasonable attorney's fees, costs, and expenses relating to Photobucket's breach of contract.

**ELEVENTH CAUSE OF ACTION**
**Violation of 17 U.S.C. § 1202(b)(3) by Photobucket**
**Photobucket User Class Against Photobucket**

248.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

249.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

250.    Upon information and belief, Photobucket has or is about to share copies of Plaintiffs' and Class Members' photos with the Unknown Defendants without the copyright management information associated with those photos.

251.    Mr. Pierce, Mrs. Hughes, Ms. Cumming, and Photobucket User Class Members seek statutory damages or the total of the Class's damages and Defendants' profits to be elected by Plaintiffs, as well as declaratory and injunctive relief, and reasonable attorney's fees, costs, and expenses relating to Photobucket's breach of contract.

**PRAYER FOR RELIEF**

252.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the following relief:

a.    Finding that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure and certifying the Class defined herein;

b.    Appointing Plaintiffs as representatives of the Class and their undersigned counsel as class counsel;

c.    Entering judgment in favor of Plaintiffs and the other Class members and against Defendants;

d.    Awarding Plaintiffs and the other Class members liquidated damages of at least $1,000 per negligent violation, $5,000 per willful or reckless violation, or actual damages, whichever is greater, for each of Defendants' violations;

e.    Awarding Plaintiffs actual and punitive damages;

f.     Awarding Plaintiffs restitution for unjust enrichment if Plaintiffs are found to have no other adequate remedy at law;

g.     Issuing an injunction prohibiting Defendants from engaging in the conduct alleged herein;

h.     Issuing a declaration of rights finding that Plaintiffs have not agreed to and are not bound by the July 2024 Terms of Use or Biometric Policy;

i.     Awarding reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and

j.     Granting such other and further relief as the Court deems appropriate.

### JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Respectfully submitted,

*/s/ Mike Kanovitz*

One of plaintiffs' attorneys

Mike Kanovitz
Aaron Tucek
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(P) (312) 243-5900
(F) (312)-243-5902
mike@loevy.com
aaron@loevy.com

Daniel Twetten
Isaac Green
LOEVY & LOEVY
2060 Broadway Street, Suite 280
Boulder, CO 80302
(P) (720) 583-6514
(F) (312)-243-5902
dan@loevy.com
green@loevy.com