IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 24-cv-03432-PAB-NRN

MAC PIERCE,
NIKI HUGHES,
SEAN HUGHES, and
VALERIE CUMMING, on behalf of all other similarly situated,

      Plaintiffs,

v.

PHOTOBUCKET INC.,

      Defendant.

---

## ORDER

---

This matter comes before the Court on Defendant Photobucket.com Inc.'s

Amended Motion to Compel Arbitration and Stay Proceedings [Docket No. 25] and

Defendant Photobucket.com, Inc.'s Motion to Dismiss the Amended Complaint [Docket

No. 54]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.    FACTS[1]

Defendant Photobucket Inc. ("Photobucket") was founded over twenty years ago and provides online photo storage to its users.  Docket No. 51 at 4, ¶ 12.  Photobucket currently stores 13 billion photos on behalf of its users.  *Id.*  Plaintiffs Mac Pierce, Niki Hughes, and Valerie Cumming used Photobucket to store photos.  *Id.*, ¶¶ 7, 8, 10-11.  Mr. Pierce last logged into his account in approximately 2014.  *Id.* at 21, ¶ 94.  Ms. Hughes last logged into her account in 2010 or 2011.  Docket No. 32-3 at 2, ¶ 6.  Ms. Cumming last logged into her account in approximately 2010.  Docket No. 51 at 24, ¶ 114.  Ms. Hughes's photos on Photobucket include photos of her minor child and husband, plaintiff Sean Hughes.  *Id.*, ¶ 8.  Mr. Hughes was never a customer of Photobucket.  *Id.*, ¶ 9.

To use Photobucket, users create an account, upload photos, and then share their photos through message boards, blogs, e-commerce sites, and social media platforms.  *Id.* at 12, ¶ 52.  Photobucket offered free accounts until 2017, at which point it required users to pay a subscription fee initially set at $399 per year.  *Id.* at 16, ¶ 67.  Following backlash, Photobucket "rescinded the subscription fee to access third-party

---

[1] Because determining whether a dispute is subject to arbitration "is similar to summary judgment practice," the Court considers the pleadings and evidence submitted by the parties and finds the following facts as undisputed unless otherwise noted.  *See Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014) (unpublished) (quoting *Hancock v. Am. Tel. & Tel. Co., Inc.,* 701 F.3d 1248, 1261 (10th Cir. 2012)); *Williams v. Experian Info. Sols. Inc.*, 2024 WL 3876171, at *7 (D. Ariz. Aug. 20, 2024) ("It is permissible to consider evidence outside the pleadings when resolving a motion to compel arbitration.  To the extent there are conflicts in the evidence submitted by the parties, the court applies a standard similar to that applicable for a motion for summary judgment.") (citation omitted).

image hosting and offered more reasonably priced subscription tiers." *Id.*, ¶ 70. By
2024, the vast majority of Photobucket users had not accessed their accounts in years,
but Photobucket still retained the users' photos. *Id.* at 17, ¶ 73. In May and June 2024,
Photobucket began an email campaign asking users whether they wanted to keep or
delete their accounts. *Id.*, ¶¶ 73-75. The emails included links labeled "Keep My
Account," "Delete My Account," "Reactivate My Account," "Unlock My Account," or
"Reset My Password." *Id.*, ¶ 74. No matter which link they clicked, users were taken to
a page to accept Photobucket's updated Terms of Use, which included a Biometric
Information Privacy Policy. *Id.* at 18, ¶¶ 77-78. The Biometric Information Privacy
Policy provides:

> By agreeing to our use of your Biometric Information you grant Photobucket, to
> the extent permitted by the laws of your region, commercialize [sic], including the
> right to license your Public User Uploaded Content to third parties for the
> scanning and processing of the Public User Uploaded Content, including
> extracting physical features, e.g. measurements, of your Biometric Information
> (e.g., face, iris, etc.), for the purpose of artificial intelligence and machine learning
> training and the subsequent uses derived therefrom.
>
> . . .
>
> Public User Uploaded Content from residents of California, Colorado,
> Connecticut, Florida, Illinois, Montana, Oregon, Texas, Utah, Virginia,
> Washington, and the European Union will not knowingly be sold, leased, traded,
> or otherwise profited from even if a user agrees to its sale, lease, trade, or
> otherwise profit from the disclosure of their Public User Uploaded Content.

*Id.* at 18, 19, ¶¶ 81, 83. If users did not opt out of the Biometric Policy within 45 days of
July 22, 2024, Photobucket claims the right to sell, lease, trade, or otherwise profit from
the users' biometric information. *Id.* at 20, ¶¶ 90-91. While users could still opt out of
the Biometric Information Policy after the 45-day period, opting out only triggered
Photobucket's promise that the users' biometric information "will not be further sold,

leased, traded, or otherwise profited from after the date [Photobucket] receive[s] and

process[es]" the opt-out request.  *Id.* at 20-21, ¶ 92.

The updated Terms of Use contained an arbitration provision.  *See* Docket No. 25-6

at 14-16.  The arbitration provision states that in relevant part:

> By agreeing to the Terms of Use, you agree that you are required to resolve any
> claim that you may have against Photobucket on an individual basis in
> arbitration, as set forth in this Arbitration Agreement.  This will preclude you from
> bringing any class, collective, or representative action against Photobucket, and
> also preclude you from participating in or recovering relief under any current or
> future class, collective, consolidated, or representative action brought against
> Photobucket by someone else.

*Id.* at 14.  The version of the Terms of Use that were in effect at the time plaintiffs

created their accounts did not include an arbitration provision.  Docket No. 32 at 2.  Mr.

Pierce agreed to the Terms of Use that were in effect as of October 11, 2008 (the "2008

Terms").  Docket No. 25-2 at 3, ¶¶ 7-8.  Ms. Hughes agreed to the Terms of Use that

were in effect as of July 9, 2006 (the "2006 Terms").  *Id.* at 4-5, ¶¶ 12-13.  Ms. Cumming

agreed to the Terms of Use that were in effect as of August 21, 2013 (the "2013

Terms").  *Id.* at 5-6, ¶ 16-17.[2]

The October 11, 2008 Terms stated in relevant part:

> Photobucket may modify or amend this Agreement without notice at any time and
> such modification will be effective upon posting by Photobucket on the Site.  Your
> continued use of the Photobucket Services after Photobucket posts a revised
> Agreement signifies your acceptance of the revised Agreement.  It is therefore
> important that you review this Agreement regularly to ensure you are updated as
> to any changes.

---

[2] The account creation dates that plaintiffs identify in their complaint conflict with
the account creation dates provided by Mr. Curry.  *See* Docket No. 51 at 21, 24 ¶¶ 93,
108, 114.  However, plaintiffs do not dispute Mr. Curry's assertions regarding the
version of the Terms that govern each plaintiff.  *See* Docket No. 32 at 2.

Docket No. 25-3 at 2.  The July 9, 2006 Terms stated:

> By using the Services you agree to the Terms of Service set forth below as they may be updated from time to time by Photobucket.com, Inc. ("Photobucket.com").  Photobucket.com may modify or terminate the Services from time to time, for any reason, and without notice, including the right to terminate with or without notice, without liability to you, any other user or any third party, provided that when Photobucket.com does so, it will update these Terms of Service.  You are advised to periodically check the website for changes in the Terms of Service.

Docket No. 25-4 at 2.  The August 21, 2013 Terms stated:

> These Terms and the Privacy Policy can change.  Again, please carefully read this document and our other policies.  We may announce if any "big" changes are made, but so long as you've used the Site after the change, regardless of any separate notice, you agree to the current posted version of the Terms.

Docket No. 25-5 at 3.

## II.  LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint.  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  Ultimately, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because he is "the party asserting jurisdiction."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

### B. __Arbitration__

The Federal Arbitration Act ("FAA") "reflect[s] both a liberal . . . policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1145 (10th Cir. 2014) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  Accordingly, courts "must rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (citation and quotation omitted).  "In addition, this liberal policy covers more than simply the substantive scope of the arbitration clause, and encompasses an expectation that [arbitration] procedures will be binding."  *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 866 (10th Cir. 1999) (citation and quotation omitted).  It is "the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (internal quotation and citation omitted).  A court discharges this duty by: "(1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted." *Id.*

"[W]hether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate."  *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors*, 59 F.4th 1090, 1097 (10th Cir. 2023).  "No party can be compelled to submit a dispute to arbitration without having previously agreed to so submit."  *Id.* (citation omitted).  "Accordingly, the first task of a court asked to compel

arbitration of a dispute is [typically] to determine whether the parties agreed to arbitrate that dispute." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Determining whether a dispute is subject to arbitration "is similar to summary judgment practice." *Bellman*, 563 F. App'x at 612. The party moving to compel arbitration "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate." *BOSC, Inc. v. Bd. of Cnty. Commissioners of Cnty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017). If the moving party satisfies this burden, "the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith." *Id.* (citing *Hancock*, 701 F.3d at 1261). "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made by the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *In re HomeAdvisor, Inc. Litig.*, No. 16-cv-01849-PAB-KLM, 2019 WL 4463890, at *2 (D. Colo. Sept. 17, 2019) (citation omitted); *Bellman*, 563 F. App'x at 612 ("In ascertaining whether questions of material fact remain, we give the nonmoving party – here, Plaintiffs – the benefit of all reasonable doubts and inferences that may arise." (citation and quotations omitted)).

A district court may "decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration." *BOSC*, 853 F.3d at 1177 (quoting *Howard v. Ferrellgas Partners, L.P.*, 748

F.3d 975, 978 (10th Cir. 2014)).  But if "material disputes of fact do exist," the FAA "calls
for a summary trial."  *Id.* (citing *Howard*, 748 F.3d at 978 (emphasis omitted)).

### III.    ANALYSIS

Photobucket filed a motion to dismiss plaintiffs' amended complaint pursuant to
Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Docket No. 54.  Pursuant to Rule 12(b)(1),
Photobucket argues that this case should be dismissed for lack of subject matter
jurisdiction because plaintiffs lack standing under Article III of the United States
Constitution.  *Id.* at 3-5.  Pursuant to Rule 12(b)(6), Photobucket argues that plaintiffs
fail to state a claim and that plaintiffs lack standing to seek redress under Virginia,
California, New York, and Washington law.  *See id.* 5-15.  Photobucket also filed a
motion to compel arbitration of plaintiffs' claims.  *See* Docket No. 25.

The Court will review the nature of plaintiffs' claims, take up Photobucket's
argument that plaintiffs lack Article III standing, and then consider the motion to compel.
Because Photobucket moves to dismiss this case pursuant to Rule 12(b)(1), the Court
must first address whether plaintiffs have standing under Article III before proceeding to
the issue of arbitration.  *Hunt v. Jack V. Waters, D.C., P.C.*, 403 F. Supp. 3d 1036, 1068
(D.N.M. 2019) ("The Court . . . has authority to decide the Motion to Compel [arbitration]
only if it has jurisdiction over the underlying controversy.") (citing *Hill v. Ricoh Ams.
Corp.,* 603 F.3d 766, 771 (10th Cir. 2010)); *Born v. Progrexion Teleservices, Inc.*, 2020
WL 4674236, at *3 (D. Utah Aug. 11, 2020) ("because [defendant] asserts a challenge
to subject matter jurisdiction, the court must address the Motion to Dismiss before it can
determine whether those three Untimely Plaintiffs must be compelled to arbitration.

Indeed, if the court lacks subject matter jurisdiction over the claims of these three

Untimely Plaintiffs, then the court lacks jurisdiction to compel them to arbitration.").

Plaintiffs seek to represent a "Photobucket User Class," consisting of "[a]ll

persons who uploaded photographs to Photobucket at any time from January 1, 2003

until May 1, 2024."  Docket No. 51 at 24, ¶ 117.  The Photobucket User Class "brings

claims under federal copyright laws, as well as statutory claims for biometric and other

privacy torts, and common law claims for breach of contract (Photobucket's Terms of

Use), unjust enrichment and conversion."  *Id.* at 25, ¶ 119.  Specifically, the

Photobucket User Class brings claims for violation of state privacy laws and common

law (Claims One and Three), *id.* at 28-30, 33-34; violation of state deceptive practices

laws (Claim Four), *id.* at 35-38; breach of contract (Claim Five), *id.* at 38-40; conversion

(Claim Six), *id.* at 40-41; unjust enrichment (Claims Seven and Eight), *id.* at 41-43; civil

conspiracy (Claim Nine), *id.* at 43-44; and violation of the Digital Millenium Copyright Act

(the "DMCA") (Claims Ten and Eleven), 17 U.S.C. § 1202(b)(1), (b)(3).  *Id.* at 44-47.

Plaintiffs also seek to represent a "Photographed Class," consisting of "[a]ll

persons who appear in photographs uploaded to Photobucket any time but did not

themselves create a Photobucket account."  *Id.* at 24, ¶ 118.  The Photographed Class

brings claims for violation of state privacy laws and common law (Claims Two and

Three), *id.* at 31-34; unjust enrichment, *id.* at 41-43 (Claim Seven); and civil conspiracy

(Claim Nine).  *Id.* at 43-44.

## A.  Article III Standing

To establish Article III standing, a plaintiff must allege "that (1) he or she has

suffered an injury in fact; (2) there is a causal connection between the injury and the

conduct complained of; and (3) it is likely that the injury will be redressed by a favorable

decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v.*

*Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)).  In order to demonstrate the first

element of standing, a plaintiff must show that she has "suffered an injury in fact – an

invasion of a legally protected interest which is (a) concrete and particularized, and (b)

actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Spokeo,*

*Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Injury in fact is a constitutional requirement.").

An injury is particularized if it affects the plaintiff in "a personal and individual way."

*Spokeo,* 578 U.S. at 339 (citation omitted).  "A 'concrete' injury must be 'de facto'; that

is, it must actually exist;" it must be "real," not "abstract."  *Id*. at 340.  Furthermore, "[a]

federal court's jurisdiction . . . can be invoked only when the plaintiff himself has

suffered 'some threatened or actual injury.'"  *Warth v. Seldin*, 422 U.S. 490, 499 (1975)

(quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 617 (1973)).

     The parties focus on the first element necessary to establish standing: whether

plaintiffs have suffered an injury in fact.  Photobucket states that plaintiffs have not

demonstrated an injury in fact because their claims are based on "a fear that

Photobucket '*could* begin' licensing photographs someday to train generative AI models

or that unknown biometrics *might* be extracted from their photos."  Docket No. 54 at 4

(footnote omitted).  Photobucket states that the complaint "expressly concedes that

Photobucket has not even entered into any such license with any party."  *Id.*  Thus,

Photobucket argues that the complaint fails to allege a threatened injury that is actual or

imminent.[3]  Plaintiffs argue that they have alleged actual and imminent injuries because the complaint alleges that Photobucket "already has put their photos to use for training AI and that it has concrete plans to continue to do so."  *Id.* at 5.

The Court will first address whether Photobucket's challenge to subject matter jurisdiction is facial or factual.  "In reviewing a facial attack, the district court must accept the allegations in the complaint as true."  *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  Alternatively, if a party makes a factual attack, "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based."  *Id.*  "In reviewing a factual attack, a court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Id.* (internal quotation and citation omitted).  "[W]hen reviewing a factual attack on a complaint, the Court may not presume the truthfulness of the complaint's factual allegations."  *Bailon v. Dillon Companies Inc.*, No. 22-cv-01999-KLM, 2023 WL 12177424, at *3 (D. Colo. Apr. 13, 2023) (internal quotation and citation omitted).

Here, Photobucket argues that "Plaintiffs have no basis to amend the complaint to plead a more concrete injury-in-fact" because Photobucket has produced "declarations establishing that Photobucket has not licensed images for biometric analysis or for use generating artificial intelligence images, and has no intention to do

---

[3] Photobucket challenges only whether plaintiffs have alleged an injury that is actual or imminent and does not contest that plaintiffs have asserted an injury that is concrete and particularized.  *See Lujan*, 504 U.S. at 560-61.  Photobucket also does not challenge the remaining elements necessary to establish Article III standing: that there is a causal connection between the injury and Photobucket's conduct and that it is likely that the injury will be redressed by a favorable decision in this case.  *See Ward*, 321 F.3d at 1266.

so." Docket No. 54 at 4 n.3. Photobucket cites the declarations of Scott Curry, Chief

Technology Officer at Photobucket. *Id.* (citing Docket Nos. 25-2, 40-1). In his April 11,

2025 declaration, Mr. Curry states, in relevant part:

> Photobucket is not licensing, and has no current plan to license, its archives for
> biometric analysis, including as to the accounts for Mr. Pierce, Ms. Hughes, and
> Ms. Cumming.

Docket No. 25-2 at 2, ¶ 3. In his August 27, 2025 declaration, Mr. Curry states:

> Notwithstanding Mr. Leonard's comment that companies were looking to
> pay for access to Photobucket's dataset, no such license was executed, and
> Photobucket has no current plans to enter or expectations of entering into such a
> license. Photobucket has not received payments from any third parties for
> access to its users' images.
>
> Photobucket has not undertaken to identify the users in its dataset,
> whether though biometric analysis or any other process, nor is Photobucket
> capable of performing any such analyses. Based on its current data,
> Photobucket is not able to identify any particular individual in any photograph in
> its dataset. Rather, Photobucket is limited to associating a saved image with a
> particular user account (which user may or may not be depicted in any
> photographs on their account). Nor has Photobucket licensed or otherwise
> authorized any third party to engage in such analyses.

Docket No. 40-1 at 2, ¶¶ 3-4. Photobucket does not explain whether Mr. Curry's

declaration is part of its factual attack on the complaint. *See* Docket No. 54 at 4 n.3.

Furthermore, Photobucket does not discuss the legal standard governing a factual or

facial attack and only addresses the legal standard governing Article III standing. *See*

*id.* at 2-3. Photobucket's argument that plaintiffs lack standing focuses primarily on

Photobucket's contention that "Plaintiffs' claims rest entirely on speculation about future

events that may never occur" and "[s]uch ruminations on potential harm fall shy of

Article III's requirements." *See id.* at 5. Such an argument constitutes a facial attack on

the complaint. Accordingly, the Court will consider Photobucket's Rule 12(b)(1) motion

as a facial attack. *See Butler v. Saul*, 2021 WL 615241, at *1 (M.D. Fla. Feb. 17, 2021)

(overruling defendant's objection that his motion to dismiss was improperly construed as a facial attack because defendant failed to raise the argument, and, "although the standard of review Defendant sets forth distinguishes between facial and factual attacks on jurisdiction, Defendant's substantive discussion of the issue does not mention this dichotomy, nor does it make clear that Defendant intended to attack the factual underpinnings of Plaintiff's invocation of federal jurisdiction") (internal citation omitted).

The complaint states that, in 2024, Photobucket CEO Ted Leonard made public statements to business and the technology press "indicating that Photobucket was in the process of licensing the billions of photos stored on its servers for biometrics and generative AI uses."  Docket No. 51 at 6, ¶ 18.  Specifically, in April 2024, Mr. Leonard told Reuters that he is "in talks with multiple tech companies to license Photobucket's 13 billion photos and videos to be used to train generative AI models that can produce new content in response to text prompts."  *Id.*, ¶ 19.  Mr. Leonard told Reuters that he has discussed the rates at which to sell the photos.  *Id.*, ¶ 20.  In May 2024, on a podcast, Mr. Leonard announced that, "We believe that we are one of the most relevant players in the AI market because of the content that we have on our platform and our ability to help leaders in the AI space train their models and evolve."  *Id.*, ¶ 21.  Mr. Leonard stated that Photobucket is in "a position to be opportunistic specifically around AI."  *Id.*, ¶ 22.  In October 2024, Mr. Leonard told Business Insider that Photobucket was planning to license photos to AI companies, and that such licensing could begin soon.  *Id.*, ¶ 23.  Through the implementation of the Biometric Policy, plaintiffs allege that Photobucket "demonstrated its intentions to license the Class members' photos."  *Id.* at 7, ¶ 24.  The complaint alleges that, in November 2024, Mr. Pierce contacted

Photobucket's customer service regarding the sale of Mr. Pierce's photos to third parties. *Id.* at 23, ¶¶ 104-05. Photobucket responded that some of Mr. Pierce's "account contents may have been made available to third parties, for the express purposes of artificial intelligence and machine learning training" and that such photos cannot be retrieved. *Id.*, ¶ 106.

While the complaint's allegations do not show that Photobucket has already distributed plaintiffs' photos, the allegations do suggest that – based on comments from Mr. Leonard, the Biometric Policy, and Photobucket's comments to Mr. Pierce – there is a risk of future use of plaintiffs' photos by third-party AI companies. Plaintiffs' contention that Photobucket's actions evince a "concrete, *present* plan" to sell photos to third parties that is "imminent," *see* Docket No. 57 at 6 (quoting *Tandy v. City of Wichita*, 380 F.3d 1277, 1284, 1289 (10th Cir. 2004)), further suggests that the injury for which plaintiffs seek redress is a risk of future harm rather than a harm that has already occurred. Thus, the Court will focus on whether such risk of future harm constitutes an injury in fact sufficient to confer standing.

"In a suit premised on the mere risk of future harm – that is, where the alleged injury-in-fact is imminent rather than actual – we must also consider the type of relief sought." *Owen-Brooks v. DISH Network Corp.*, 23-cv-01168-RMR-SBP, 2024 WL 4338133, at *5 (D. Colo. Aug. 23, 2024), *report and recommendation adopted,* 2024 WL 4333660 (D. Colo. Sept. 27, 2024) (citation omitted). In a suit for damages, a risk of future harm alone does not confer standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021) (finding "persuasive" TransUnion's argument that, "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete

harm – at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm"); *Owen-Brooks*, 2024 WL 4338133, at *5 ("for *damages* based only on a risk of future harm, the plaintiff must allege some additional, currently felt concrete harms for standing") (internal quotation omitted).  On the other hand, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."  *See TransUnion LLC*, 594 U.S. at 435.

Here, plaintiffs seek damages and injunctive relief.  Because plaintiffs do not allege additional concrete harms arising out of the risk that their photos will be distributed to third parties, plaintiffs do not have standing to pursue damages as a form of relief.  However, the Court finds that the risk of plaintiffs' photos being distributed is sufficiently imminent and substantial as to constitute an injury in fact regarding plaintiffs' requests for injunctive relief.  Mr. Leonard's comments demonstrate that Photobucket has taken concrete action to distribute plaintiffs' photos, including having discussions with companies specializing in artificial intelligence, even going as far as discussing the potential price points.  *See* Docket No. 51 at 6, ¶¶ 19-20.  Mr. Leonard also stated that Photobucket was "planning to license photos to AI companies, and that such licensing could begin soon."  *Id.*, ¶ 23.  Mr. Leonard's comments are supported by the implementation of the Biometric Policy and Photobucket's communications with Mr. Pierce.

Accordingly, the Court finds that plaintiffs plausibly allege an injury in fact that confers Article III standing for their claims that seek injunctive relief.[4]

### B.  Motion to Compel Arbitration

Photobucket argues that plaintiffs must arbitrate their claims pursuant to Photobucket's 2024 Terms of Use.  *See* Docket No. 25 at 6-15.  Photobucket contends that plaintiffs were bound by the Terms of Use in effect at the time that plaintiffs registered their accounts, *id.* at 6-7, and had notice of the 2024 Terms of Use (the "2024 Terms"), that contained the arbitration provision, because Photobucket emailed plaintiffs notice and provided notices on Photobucket's website and mobile applications.  *Id.* at 7-11.[5]  Photobucket contends that plaintiffs assented to the 2024 Terms "[b]ecause each Plaintiff is bound by the earlier terms of use through reliance on same, was subject to constructive notice in the manner agreed-to in such terms, and the Amended Terms were conspicuous and readily accessible."  *Id.* at 11-13.

---

[4] Photobucket argues that plaintiffs lack standing to bring claims on behalf of a class that is subject to the laws of states where "plaintiff has never been subject or where plaintiff has never resided."  Docket No. 54 at 7.  The Court finds that this argument does not implicate Article III standing and declines to address it at this stage.  As Photobucket acknowledges, the Court has previously found that such an argument implicating "a choice-of-law analysis . . . is best reserved for the class certification stage."  *See Butler v. Specialized Loan Servicing LLC*, No. 24-cv-01087-PAB-SBP, 2025 WL 2613745, at *5 (D. Colo. Sept. 10, 2025).

[5] Photobucket contends that plaintiffs had "actual and at a minimum constructive notice of the implementation of the Amended Terms."  Docket No. 25 at 8.  Because plaintiffs deny that they had actual notice of the arbitration agreement, *see* Docket No. 32 at 5-6, the Court will consider whether plaintiffs had constructive or inquiry notice.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76-77 (2d Cir. 2017) (where plaintiff "attests that he was not on actual notice of the hyperlink to the Terms of Service or the arbitration provision itself," the court must consider whether plaintiff "was on inquiry notice of the arbitration provision by virtue of the hyperlink to the Terms of Service on the Payment Screen and, thus, manifested his assent to the agreement by clicking 'Register'").

Plaintiffs argue that they did not have actual notice of the 2024 Terms because, "having checked their email accounts," plaintiffs "deny ever receiving or seeing this email until it was filed in the course of litigation."  Docket No. 32 at 5.  Plaintiffs maintain that they did not have constructive notice because they never agreed to monitor Photobucket's website to stay apprised of modifications to the Terms, the Terms did not "alert users that future changes could include adding an arbitration provision and did not contemplate superseding agreements," and Photobucket terminated the contracts between the parties.  *Id.* at 6-8.  Plaintiffs argue that they made no manifestation of intent to be bound by the 2024 Terms.  *Id.* at 9-12.  Plaintiffs contend that Mr. Hughes is not bound to an arbitration agreement, and that plaintiffs did not knowingly and voluntarily waive their right to a jury trial.  *Id.* at 12-15.  Finally, plaintiffs argue that, at the very least, the DMCA claim is not subject to arbitration.  *Id.* at 15.

### 1.  *Whether Mr. Pierce Agreed to Arbitrate His Claims*

The last time that Mr. Pierce logged into his Photobucket account, prior to his correspondence with Photobucket in 2024, was in 2014.  Docket No. 32-1 at 2, ¶ 4.  In May and June 2024, Photobucket sent Mr. Pierce several emails, informing him that his account was deactivated.  *Id.* at 3, ¶ 8.  Photobucket sent Mr. Pierce additional emails in September, October, and November 2024 informing Mr. Pierce that his account was locked.  *Id.*, ¶ 9.  On November 7, 2024, Mr. Pierce clicked on the link provided in the email and was advised that he had to agree to the 2024 Terms, including the Biometric Policy, to recover his account.  *Id.*, ¶ 11.  Mr. Pierce contacted Photobucket's customer service about whether his photos were being used for biometric purposes.  *Id.* at 3-4, ¶¶ 12-14.  Photobucket's customer service representative responded, "Your account

was automatically opted-in after the 45-day opt-out period, so some of your account

contentss may have been made available to third parties, for the express purposes of

artificial intelligence and machine learning.  I apologize that we cannot retrieve any

Public data that may have been previously shared for this purpose."  *Id*. at 4, ¶ 14.

Despite searching, Mr. Pierce could not locate the July 2024 email from Photobucket

informing him of the 2024 Terms.  *Id.*, ¶ 15.

### a.  Choice of Law

The Court first addresses which state's laws govern the formation of any contract

between Photobucket and Mr. Pierce.  The 2008 Terms apply to Mr. Pierce.  Docket No.

25-2 at 3, ¶ 7; Docket No. 25-3.  The 2008 Terms contain a choice of law provision,

indicating that the laws of New York govern.  Docket No. 25-3 at 5.  The 2024 Terms'

choice of law provision states that the laws of Colorado govern.  Docket No. 25-6 at 14.

A district court "ordinarily applies the choice-of-law rules of the State in which it

sits."  *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1270 (10th Cir. 2021).  Colorado

has adopted the choice-of-law approach of the Restatement (Second) of Conflict of

Laws (the "Restatement").  *Kipling v. State Farm Mut. Auto. Ins. Co.,* 774 F.3d 1306,

1310 (10th Cir. 2014).  Under the Restatement approach, "courts apply the law of the

state chosen by the contracting parties to govern their rights and duties under the

contract *unless* (1) the chosen state has no substantial relationship to the parties or the

transaction and there is no other reasonable basis for the parties' choice; or (2)

application of the law of the chosen state would be contrary to a fundamental policy of a

state whose law would otherwise govern."  *Armata v. Certain Underwriters at Lloyd's*

*London – Syndicate 1861*, No. 21-cv-00160-NYW, 2022 WL 3227619, at *3 (D. Colo.

Aug. 10, 2022) (internal quotation and citation omitted).  "[C]ontractual choice-of-law provisions are generally enforced in Colorado."  *Richardson v. Allstate Fire & Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1190 (D. Colo. 2022).

The parties do not dispute that Mr. Pierce assented to the 2008 Terms.  Docket No. 25-3 at 5.  However, the parties do dispute whether Mr. Pierce agreed to the 2024 Terms, which includes a Colorado choice of law provision.  Docket No. 25-6 at 14.  As noted by the Tenth Circuit, there is a "logical flaw" in applying Colorado law where the parties dispute whether the 2024 Terms constitute a valid contract.  *See B-S Steel of Kan., Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006).

The Fourth Circuit, in *Klein v. Verizon Commc'ns, Inc.*, 674 F. App'x 304, 308 (4th Cir. 2017) (unpublished), addressed a similar choice of law issue.  In *Klein*, the parties "specifically contracted a valid and undisputed choice of law provision" in a 2010 agreement, which contained a Virginia choice of law provision.  *Id.*  However, the parties disputed whether a 2012 notification, which contained a Maryland choice of law provision, constituted an effective modification of the 2010 agreement.  *Id.*  The Fourth Circuit applied Virginia choice of law rules.  *Id.* at 307-308.  *Klein* held that the district judge erred by applying Maryland law, rather than Virginia law, in determining "the key issue between the parties, that is, whether the 2012 Notification was effective such that the parties were required to arbitrate their dispute."  *Id.* at 308.  *Klein* noted that the "problem with the approach taken by the district court . . . is that until the 2012 Notification became binding, which the parties dispute was ever the case, the parties operated pursuant to the prior choice of law provision."  *Id.*  Here, the parties agreed to the New York choice of law provision, while it is disputed whether the 2024 Terms

constitute an effective agreement.  By extension, it is disputed whether Mr. Pierce

agreed to the Colorado choice of law provision.  Accordingly, the Court will apply New

York law in determining whether Mr. Pierce and Photobucket had an agreement to

arbitrate their disputes.[6]

### b.  Mutual Assent

"To prove an enforceable contract under New York law, a party must establish an

offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."

*Coe v. Coca-Cola Co.*, 702 F. Supp. 3d 140, 154 (W.D.N.Y. 2023) (internal quotation

and citation omitted).  "Where an offeree does not have *actual* notice of certain contract

terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and

assents to them through conduct that a reasonable person would understand to

constitute assent."  *Id.* (citation omitted).  "Inquiry notice is actual notice of

circumstances sufficient to put a prudent man upon inquiry."  *Berkson v. Gogo LLC*, 97

F. Supp. 3d 359, 394 (E.D.N.Y. 2015) (applying New York law) (citation omitted).  "In

determining whether an offeree is on inquiry notice of contract terms, New York courts

look to whether the term was obvious and whether it was called to the offeree's

attention."  *Coe*, 702 F. Supp. 3d at 154 (citation omitted).

In *Sudakow v. CleanChoice Energy, Inc.*, 153 F.4th 280, 283 (2d Cir. 2025)

(applying New York law), plaintiff entered into an enrollment agreement with defendant,

which gave defendant the right to unilaterally modify the agreement so long as

---

[6] Plaintiffs contend that "formation is likely governed by the law of Illinois and
Iowa, where Plaintiffs lived when Photobucket alleges they became bound to the 2024
terms."  Docket No. 32 at 4 n.2.  However, plaintiffs acknowledge that the laws of
Colorado, California, New York, Illinois, and Iowa are "substantially the same," drawing
on case law from all of these jurisdictions.  *Id*.

defendant gave a 30-day written notice of the modification.  The enrollment agreement did not contain an arbitration provision.  *Id.*  One month after plaintiff agreed to the enrollment agreement, defendant mailed plaintiff a "Welcome Package."  *Id.*  Enclosed in the Welcome Package were "Subsequent Terms" and a cover letter.  *Id.*  The cover letter did not mention the Subsequent Terms or prompt plaintiff to sign her name.  *Id.* at 283-84.  The Subsequent Terms included an arbitration provision and stated by "signing this Agreement, You agree to initiate electricity supply service and to begin enrollment." *Id.* at 284.  *Sudakow* held that plaintiff did not manifest assent to the arbitration notice by continuing to use defendant's services and making monthly payments.  *Id.* at 287. *Sudakow* noted that the Subsequent Terms specified that "by *signing* this Agreement, You agree to initiate electricity supply service and to begin enrollment," such that a reasonable consumer would "conclude that assent can be manifested only through a signature."  *Id.* at 287-88.  The defendant argued that plaintiff assented to the Subsequent Terms by continuing to make monthly payments in response to receiving her monthly bill.  *Id.* at 288.  *Sudakow* rejected this argument, finding that "those payments cannot be mistaken for assent" because plaintiff did not know or have reason to know that defendant would infer her assent from such conduct.  *Id.*

In *Schnabel*, which applied Connecticut and California law, but was relied upon by *Sudakow*, the plaintiffs enrolled in a discount club that charged a monthly fee. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113-17 (2d Cir. 2012).  After plaintiffs enrolled, defendants emailed plaintiffs a document containing Terms and Conditions, which included an arbitration provision.  *Id.* at 116-17.   *Schnabel* held that plaintiff did not assent to the arbitration agreement by continuing to permit autopayments to

defendant.  *Id.* at 128.  *Schnabel* also held that "acceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound."  *Id.*  In *Schnabel*, however, "plaintiffs were never put on inquiry notice of the arbitration provision, and their continued credit-card payments, which were auto-debited from their credit cards, were too passive for any reasonable fact-finder to conclude that they manifested a subjective understanding of the existence of the arbitration and other emailed provisions and an intent to be bound by them in exchange for the continued benefits . . . offered."  *Id.* at 128-29.

The Court, as informed by *Sudakow* and *Schnabel*, concludes that Mr. Pierce did not manifest assent to the 2024 Terms.  The 2008 Terms informed Mr. Pierce that his "continued use" of Photobucket would constitute acceptance to any modifications:

> Photobucket may modify or amend this Agreement without notice at any time and such modification will be effective upon posting by Photobucket on the Site.  Your continued use of the Photobucket Services after Photobucket posts a revised Agreement signifies your acceptance of the revised Agreement.  It is therefore important that you review this Agreement regularly to ensure you are updated as to any changes.

Docket No. 25-3 at 2.  Mr. Pierce last logged into his Photobucket account in 2014.[7] Docket No. 51 at 21, ¶ 94.  While Mr. Pierce's photos continued to be stored on Photobucket's platform, there is nothing in the 2008 Terms that indicated "continued use" includes the act of failing to remove photos from Photobucket.  Instead of demanding that Mr. Pierce remove his photos, Photobucket said that it was "safeguarding your photos hoping you would return."  *See, e.g.*, Docket No. 31-1 at 22.

---

[7] The parties do not argue that Mr. Pierce was bound by any revisions to the Terms that occurred between 2008 and 2014.

Thus, a reasonable person would not understand his failure to take his photos off of
Photobucket, after not logging in for nearly ten years, to constitute "continued use" and
thus acceptance of any revised terms. *See Sudakow,* 153 F.4th at 288 (plaintiff "had no
reason to believe that [defendant] expected her either to cancel her service or to agree
to arbitrate. So her failure to act affirmatively did not carry a significance that
reasonable people in the parties' positions would understand to be assent.") (internal
quotation and citation omitted); *Schnabel*, 697 F.3d at 128–29 ("continued credit-card
payments, which were auto-debited from their credit cards, were too passive for any
reasonable fact-finder to conclude that they manifested a subjective understanding of
the existence of the arbitration and other emailed provisions and an intent to be bound
by them in exchange for the continued benefits [defendant] offered").

Accordingly, the Court finds that Mr. Pierce did not enter into an agreement with
Photobucket to arbitrate his claims.

### 2. Whether Ms. Hughes Agreed to Arbitrate Her Claims

Ms. Hughes used Photobucket to share photos of her child. Docket No. 32-3 at
2, ¶ 4. Ms. Hughes last logged into Photobucket around 2010 or 2011. *Id.*, ¶ 6. Ms.
Hughes continues to have access to the email account associated with her Photobucket
account, she occasionally checks that email, and she is not in the habit of deleting
emails from that account. *Id.* at 3, ¶ 7. Ms. Hughes received a number of emails from
Photobucket over the years that seemed to entice her to return to Photobucket or
"threatened deactivation." *Id.*, ¶ 8. Over time, due to the volume of emails Ms. Hughes
received from Photobucket, Ms. Hughes stopped paying attention to Photobucket's

emails.  *Id.*  It is possible Photobucket's emails were categorized as spam, which are then automatically deleted after several weeks by her email provider.   *Id.*

### a.  Choice of Law

Ms. Hughes does not contest that she was bound by the 2006 Terms.  Docket No. 25-2 at 4, ¶ 12; *see* Docket No. 25-4.  The 2006 Terms contain a California choice of law provision.  Docket No. 35-4 at 3.  For the reasons stated *supra* § III.B.1.a., the Court will apply California law as to whether Ms. Hughes entered an agreement to arbitrate her claims.

### b.  Mutual Assent

"Under California law and generally applicable principles of contract law, the burden is on [defendant] as the party seeking arbitration to show that it provided notice of a new [term of service] and that there was mutual assent to the contractual agreement to arbitrate."  *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) (citation omitted).  "Mutual assent requires, at a minimum, that the party relying on the contractual provision establish that the other party had notice and gave some indication of assent to the contract."  *Id.* (citation omitted).

The Court finds that Ms. Hughes did assent to the 2024 Terms.  The 2006 Terms stated the following:

> By using the Services you agree to the Terms of Service set forth below as they may be updated from time to time by Photobucket.com, Inc. ("Photobucket.com").  Photobucket.com may modify or terminate the Services from time to time, for any reason, and without notice, including the right to terminate with or without notice, without liability to you, any other user or any third party, provided that when Photobucket.com does so, it will update these Terms of Service.  You are advised to periodically check the website for changes in the Terms of Service.

Docket No. 25-4 at 2.  The 2006 Terms told Ms. Hughes that she was "advised to

periodically check the website for changes in the Terms of Service."  *Id.*  The 2006

Terms "necessarily inform[] how a reasonably prudent user would interact" with

Photobucket's website.  *See Needleman v. Golden 1 Credit Union,* 474 F. Supp. 3d

1097, 1104 (N.D. Cal. 2020) (applying California law).  In *Needleman*, the plaintiff

agreed to an online banking agreement that informed plaintiff of the following:

> It is your responsibility to use Electronic Access regularly to check for updates
> . . . .  Regardless of whether Golden 1 is able to deliver an e-mail notification to
> you, you agree that Communications will be deemed transmitted and received as
> soon as Golden 1 makes [them] available to you through Online Banking.  You
> further agree to promptly review Communications made available to you through
> Online Banking.

474 F. Supp. 3d at 1100.  *Needleman* found that a "reasonable user in Needleman's

situation would have understood this [language] as an obligation to utilize the 'View

Statements' page to stay apprised of important disclosures."  *Id.* at 1104.  "Because

Needleman explicitly accepted the terms of Golden 1's online statements program, he

was 'on notice' that critical information would be conveyed to him online rather than

through the mail."  *Id.*  Thus, the court found that the plaintiff had constructive notice of

an arbitration agreement that was communicated through the defendant's online

banking portal.  *Id.* at 1105.  Furthermore, *Needleman* found that the plaintiff assented

to the arbitration agreement by failing to opt-out of the arbitration agreement within the

time allotted by the agreement.  *See id.* ("Here, the 60-day opt-out window applied

equally to all Golden 1 customers, whether they received notice of the arbitration

agreement through the mail or through the online banking portal.  Because Needleman

did not opt out within the allotted time, Golden 1 was justified in treating this as consent

to the updated terms.").  Similarly, here, the 2006 Terms told Ms. Hughes that she had

an obligation to periodically check Photobucket's website for updates to the Terms.
Docket No. 25-4 at 2.  The 2024 Terms and arbitration provision constitute an update to
the Terms that Ms. Hughes had an obligation to stay apprised of.  Ms. Hughes assented
to the 2024 Terms because they informed her that failure to opt out within 45 days of
the effective date would constitute acceptance, and Ms. Hughes did not opt out.  *See*
Docket No. 25-6 at 9.  Accordingly, the Court finds that Ms. Hughes agreed to arbitrate
her claims against Photobucket.

### c.  Scope of the Arbitration Agreement

The only claims plaintiffs contend fall outside the arbitration agreement are the
DMCA claims, which includes Ms. Hughes's DMCA claim.  Docket No. 32 at 15.
Plaintiffs cite the following provision in the arbitration agreement:

> [Y]ou and Photobucket each retain the right to bring an individual action in small
> claims court and the right to seek injunctive or other equitable relief in a court of
> competent jurisdiction to prevent the actual or threatened infringement,
> misappropriation or violation of a party's copyrights, trademarks, trade secrets,
> patents or **other intellectual property rights**.

Docket No. 25-6 at 15 (emphasis added).  Photobucket takes issue with plaintiffs'
interpretation that the bolded portion of this provision encompasses plaintiffs' DMCA
claims.  *See* Docket No. 35 at 10.  Photobucket argues that "each of the rights
preceding the catchall relied on by Plaintiffs is an individual *species* of intellectual
property (e.g., patent, copyright, etc.), not a basis for liability *related* to such property
rights (e.g., attribution of authorship)."  *Id.*  Photobucket contends that the DMCA claims
are subject to arbitration because the DMCA does not create new property rights.  *Id.*

Plaintiffs bring their DMCA claims pursuant to 17 U.S.C. § 1202(b)(1) and (b)(3).
Docket No. 51 at 44-47.  Plaintiffs allege that they are the owners of the copyrighted

photos that are stored on Photobucket's services.  *Id.* at 44, ¶ 235.  Plaintiffs allege that

Photobucket's distribution of plaintiffs' copyrighted photos, to entities specializing in

artificial intelligence, will result in the removal of copyright management information

("CMI") from the photos, and that Photobucket has reason to know that such removal is

likely to occur.  *Id.* at 44-47, ¶¶ 236-250.  Section 1202(b) states in relevant part:

> (b) Removal or alteration of copyright management information.–No person
> shall, without the authority of the copyright owner or the law–
>
> > (1) intentionally remove or alter any copyright management information,
> > [or]
> >
> > . . .
> >
> > (3) distribute, import for distribution, or publicly perform works, copies of
> > works, or phonorecords, knowing that copyright management information
> > has been removed or altered without authority of the copyright owner or
> > the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable
> grounds to know, that it will induce, enable, facilitate, or conceal an infringement
> of any right under this title.

17 U.S.C. § 1202 (b).  For a § 1202(b) claim, "the defendant must (1) intentionally

remove CMI under section 1202(b)(1) or distribute copyrighted works knowing that CMI

was removed under section 1202(b)(3); and (2) know or have reason to know that its

conduct would induce, enable, facilitate, or conceal infringement."  *New York Times Co.*

*v. Microsoft Corp.*, 777 F. Supp. 3d 283, 310 (S.D.N.Y. 2025) (internal quotation

omitted) (citing *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020)).

     The Court finds that the Ms. Hughes' DMCA claim is excluded from the

arbitration agreement.  Plaintiffs allege that Photobucket's conduct has led to the

removal of CMI and will thus "enable, facilitate, or conceal copyright infringement."

Docket No. 51 at 46, ¶ 246.  Plaintiffs seek injunctive relief under their DMCA claims.

*Id.* at 46, 47, ¶¶ 247, 251.  Even accepting Photobucket's argument that the DMCA does not create new property rights, plaintiffs seek injunctive relief under their DMCA claims to prevent the infringement of their copyrights.  The arbitration agreement explicitly excludes from arbitration actions meant to prevent the actual or threatened infringement of a party's copyrights.  Because the DMCA claims are unambiguously excluded from the arbitration agreement, the Court need not apply a presumption of arbitrability.  *See Granite Rock*, 561 U.S. at 301.  Accordingly, the Court finds that Ms. Hughes's DMCA claim is not subject to arbitration.  The remainder of Ms. Hughes's claims are subject to arbitration.[8]

### 3.  Whether Ms. Cumming Agreed to Arbitrate Her Claims

The complaint alleges that Ms. Cumming created her Photobucket account "in the early 2000s" and she last used Photobucket "around 2010."  Docket No. 51 at 24, ¶ 114; *see also* Docket No. 32-2 at 2, ¶ 4.  Mr. Curry states, however, that Ms. Cumming did not create her account until August 21, 2013.  *Id.* at 5, ¶ 16.  As discussed *supra* n.2, the parties do not dispute that Ms. Cumming was subject to the 2013 Terms.

---

[8] The arbitration agreement states, in relevant part, as follows:

You and Photobucket agree that any dispute, claim or controversy arising out of or relating to (a) these Terms of Use or the existence, breach, termination, enforcement, interpretation or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms of Use, will be settled by binding arbitration between you and Photobucket, and not in a court of law. You acknowledge and agree that you and Photobucket are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding.

Docket No. 25-6 at 15.

### a. Choice of Law

The 2013 Terms contain a New York choice of law provision.  Docket No. 25-5 at

3.  For the reasons stated *supra* § III.B.1.a., the Court will apply New York law as to

whether Ms. Cumming entered an agreement to arbitrate her claims.

### b. Mutual Assent

The 2013 Terms state in relevant part:

> These Terms and the Privacy Policy can change.  Again, please carefully read
> this document and our other policies.  We may announce if any "big" changes
> are made, but so long as you've used the Site after the change, regardless of any
> separate notice, you agree to the current posted version of the Terms.

Docket No. 25-5 at 3.  The 2013 Terms state that Ms. Cumming agrees to any changes

to the Terms "so long as [she has] used the Site after the change."  Docket No. 25-5 at

3.  In applying New York law, as discussed regarding Mr. Pierce's claim, the Court finds

that Ms. Cumming did not manifest assent to the 2024 Terms.  It is unclear whether the

last time Ms. Cumming logged into her account was 2010 or 2013.  *See* Docket No. 25-

2 at 5, ¶ 16; Docket No. 32-2 at 2, ¶ 4.  However, regardless of whether Ms. Cumming

last used Photobucket in 2010 or 2013, a reasonable person in Ms. Cumming's position

would not understand her failure to take photos off of Photobucket to mean that she

"used" Photobucket after 2010 or 2013 and thus assented to the 2024 Terms.  *See*

*Sudakow,* 153 F.4th at 288; *Schnabel*, 697 F.3d at 128–29.

Accordingly, the Court finds that Ms. Cumming did not agree to arbitrate her

claims with Photobucket.

### 4. Whether Mr. Hughes Agreed to Arbitrate His Claims

Mr. Hughes is Ms. Hughes's husband and was never a customer of Photobucket.

Docket No. 51 at 4, ¶ 9.  However, the photos Ms. Hughes uploaded included Mr.

Hughes and their child.  *Id.*, ¶ 8.  Photobucket contends that Mr. Hughes was bound to

the Terms as a third-party beneficiary, arguing that plaintiffs "may not, while seeking to

enforce duties and obligations under an agreement, at the same time argue that the

provisions of that contract do not apply to them."  *See* Docket No. 25 at 6 (internal

quotation and alterations omitted) (quoting *Parker v. Ctr. for Creative Leadership*, 15

P.3d 297, 298-99 (Colo. App. 2000)).  Plaintiffs argue that Mr. Hughes was a third-party

beneficiary to the contract between Ms. Hughes and Photobucket that was effectuated

through the 2006 Terms.  *See* Docket No. 32 at 12-13.  However, plaintiffs contend that

Mr. Hughes was not a third-party beneficiary to the 2024 Terms.  *See id.* at 13.

The parties' arguments presume that Mr. Hughes is in fact a third-party

beneficiary to the 2006 Terms.  Therefore, the Court will consider this issue first.  "A

third party beneficiary is someone who may enforce a contract because the contract is

made expressly for his benefit."  *Ford Motor Warranty Cases*, 89 Cal. App. 5th 1324,

1336 (2023) (citation omitted).[9]  "A person only incidentally or remotely benefited from a

contract is not a third party beneficiary" and the "mere fact that a contract results in

---

[9] The Court applies California law given the California choice of law provision in
the 2006 Terms that was applicable to Ms. Hughes.  Even if the Court were to apply the
Colorado choice of law provision in the 2024 Terms, now that the Court finds that the
2024 Terms constitute a valid contract as to Ms. Hughes, Colorado law governing third-
party beneficiaries is substantially similar to California law.  *See Everett v. Dickinson &
Co.*, 929 P.2d 10, 12 (Colo. App. 1996) ("A third-party beneficiary may enforce a
contract only if the parties to that contract intended to confer a benefit on the third party
when contracting; it is not enough that some benefit incidental to the performance of the
contract may accrue to the third party. . . .  Such an intent to benefit a third party must
be apparent from the construction of the contract in light of all surrounding
circumstances, and the intent of the parties is the key inquiry when determining whether
a nonsignatory is a third-party beneficiary entitled to enforce the agreement.").

benefits to a third party does not render that party a third party beneficiary."  *Id.* (internal quotations and citations omitted).  The parties must have intended for the third party to benefit under the contract.  *Id.* at 1337.  To show that the parties intended to benefit the third party, the third party must show, "under the express terms of the contract at issue and any other relevant circumstances under which the contract was made," the following:

> (1) the third party would in fact benefit from the contract; (2) a motivating purpose of the contracting parties was to provide a benefit to the third party; and (3) permitting the third party to enforce the contract is consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

*Id.* (internal quotations and citation omitted).  There are no facts in the complaint indicating that Mr. Hughes is a third-party beneficiary of the 2006 Terms.  The complaint merely alleges that Ms. Hughes uploaded photos of Mr. Hughes, that Mr. Hughes never created a Photobucket account, and Mr. Hughes never agreed to any of Photobucket's terms.  Docket No. 51 at 24, ¶¶ 109-11.  Furthermore, there is no indication in the 2006 Terms that Ms. Hughes and Photobucket intended to benefit Mr. Hughes as a third party.  Mr. Hughes's mere "claim[]" that he is a third- party beneficiary is insufficient to establish his status as such.  *See* Docket No. 32 at 12-13.  Because Mr. Hughes is not a third-party beneficiary to the 2006 Terms, he cannot arbitrate his claims on the basis that the 2024 Terms constitute a modification of the 2006 Terms.  Furthermore, to the extent the 2024 Terms can be viewed as a new contract, there is no evidence that Mr. Hughes assented to the 2024 Terms.[10]

---

[10] The complaint alleges that the Photographed Class, including Mr. Hughes, "includes friends, family members, and privies of the Photobucket User Class" and "also brings claims for breach of the user agreement as third-party beneficiaries."  Docket No. 51 at 25, ¶ 120.  As discussed above, this conclusory statement is not well pled.

The Court rejects Photobucket's argument that Mr. Hughes is equitably estopped from litigating his claims. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*, 478 F. Supp. 3d 919, 927 (C.D. Cal. 2020) (internal quotation and citation omitted).[11] "This doctrine has been used to hold nonsignatories to arbitration clauses where the nonsignatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Id.* A party can also be equitably estopped "where the party's claims are intimately founded in and intertwined with the underlying contract, even if they do not directly depend on the contract itself." *Id.* (internal quotation and citation omitted). Here, Mr. Hughes brings the following claims against Photobucket: violation of state privacy laws and common law (Claim Two), Docket No. 51 at 31-32; unjust enrichment (Claim Seven), *id.* at 41-42; and civil conspiracy (Claim Nine). *Id.* at 43-44. Even if Mr. Hughes were a third-party beneficiary to the 2006 or 2024 Terms and could bring claims arising out of those contractual relations, his claims brought pursuant to privacy statutes, for unjust enrichment, and for civil conspiracy do not implicate a contract with

---

Furthermore, while the complaint claims that the Photographed Class brings claims for breach of contract, Count Five, which is the breach of contract claim, only refers to the User Plaintiffs and not to any third-party beneficiaries. *See* Docket No. 51 at 38-40. Accordingly, the Court will not consider any breach of contract claim brought on behalf of Mr. Hughes and the Photographed Class.

[11] Colorado law recognizes the doctrine of equitable estoppel. *See N.A. Rugby Union LLC v. United States of Am. Rugby Football Union*, 442 P.3d 859, 866 (Colo. 2019) ("the principle of equitable estoppel can bind a nonsignatory to an arbitration provision in an agreement when the nonsignatory has knowingly exploited that agreement, as, for example, by claiming or accepting direct benefits of the agreement").

Photobucket.  *See Davis v. Nissan N. Am., Inc.,* 100 Cal. App. 5th 825, 837 (2024) (holding that equitable estoppel did not apply where "Plaintiffs' complaint does not allege that [defendant] breached any obligations under the sale contract between them and the dealership.  Rather, the complaint alleges violations of manufacturer warranties under the Song-Beverly Act and a related tort claim.").  And Photobucket makes no argument that Mr. Hughes's claims are intimately founded in and intertwined with an underlying contract.

Mr. Hughes is not a third-party beneficiary to any contract between Ms. Hughes and Photobucket.  Accordingly, the Court finds that Mr. Hughes's claims are not subject to arbitration.

### C.  Whether Ms. Hughes Voluntarily Waived Her Right to a Jury Trial

As discussed above, the Court finds that Ms. Hughes agreed to arbitrate her claims with Photobucket through her assent to the 2024 Terms.  The 2024 Terms' arbitration provision states in relevant part:

> By agreeing to the Terms of Use, you agree that you are required to resolve any claim that you may have against Photobucket on an individual basis in arbitration, as set forth in this Arbitration Agreement.  This will preclude you from bringing any class, collective, or representative action against Photobucket, and also preclude you from participating in or recovering relief under any current or future class, collective, consolidated, or representative action brought against Photobucket by someone else.

Docket No. 25-6 at 15.

Plaintiffs argue that they did not knowingly and voluntarily waive their right to a jury trial under the Seventh Amendment because there is "no evidence that Plaintiffs made any affirmative voluntary act demonstrating knowing agreement to waive their jury rights" and the "July 2024 notice emails do not inform users that by doing nothing they

would be waiving their right to a jury." Docket No. 32 at 14. Plaintiffs contend that they

had "no opportunity to negotiate and faced a confusing and misleading process to even

recover their photos without agreeing to the 2024 Terms" and that "there is a gross

disparity in sophistication and bargaining conditions between Photobucket and the

Plaintiffs." *Id.* at 5. Specifically, plaintiffs note that they are "consumers whose

accounts Photobucket had already deactivated and who had endured repeated efforts

by Photobucket to use their photos as leverage to get them to sign up for a paid

subscription." *Id.* Because the Court will compel Ms. Hughes's claims to arbitration,

and not those of Mr. Pierce, Mr. Hughes, and Ms. Cumming, the Court will only consider

this argument as it pertains to Ms. Hughes.

In determining whether a jury trial waiver was knowing and voluntary, courts

consider the following:

> (1) the conspicuousness of the provision in the contract; (2) the level of
> sophistication and experience of the parties entering into the contract; (3) the
> opportunity to negotiate terms of the contract; (4) the relative bargaining power of
> each party; and (5) whether the waiving party was represented by counsel.

*Woodward, Inc. v. ZHRO Sols., LLC*, No. 18-cv-01468-PAB-STV, 2019 WL 1438076, at

*2 (D. Colo. Mar. 31, 2019). However, the Court has already addressed and rejected

Ms. Hughes's arguments in finding that she entered an agreement to arbitrate their

claims. "[G]eneral contract principles govern the enforceability of arbitration

agreements and . . . no heightened 'knowing and voluntary' standard applies, even

where the covered claims include federal statutory claims generally involving a jury trial

right." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1372 (11th Cir. 2005);

*Urbanic v. Travelers Ins. Co.*, No. 10-cv-02368-WYD-MJW, 2011 WL 1743412, at *9 (D.

Colo. May 6, 2011) ("A party waives its right to a jury trial by signing an agreement to

arbitrate . . . through traditional principles of contract or agency law, and there is no constitutional right to a jury trial on claims which are required to be arbitrated pursuant to a valid arbitration provision") (citation omitted); *Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002) ("The Seventh Amendment right to a trial by jury is limited by a valid arbitration provision that waives the right to resolve a dispute through litigation in a judicial forum.").  Accordingly, the Court finds that Ms. Hughes's Seventh Amendment rights were not violated.

### D.  <u>Whether to Stay this Proceeding Pending Arbitration</u>

"The determination about whether it is appropriate to stay litigation among the parties' remaining non-arbitrable claims is left to the district court 'as a matter of its discretion to control its dockets.'"  *Stanek Holdco, Inc. v. Water Res. Grp., Inc.*, No. 19-cv-3194-WJM-SKC, 2020 WL 4753895, at *7 (D. Colo. Aug. 17, 2020) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)).  However, the "mere fact that piecemeal litigation results from the combination of arbitrable and nonarbitrable issues is not reason enough to stay the entire case."  *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols.*, Inc., 567 F.3d 1191, 1200 (10th Cir. 2009) (citation and alteration omitted).  On the other hand, a stay of the entire proceedings is "appropriate when resolution of the arbitrable claim will have a preclusive effect on the nonarbitrable claim or when the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit."  *Id.* (internal quotation and citation omitted).

Except for the DMCA claim, Ms. Hughes's claims against Photobucket are subject to arbitration, which includes her claims for claims for violation of state privacy

laws and common law (Claim One), *id.* at 28-30; violation of state deceptive practices laws (Claim Four), *id.* at 35-38; breach of contract (Claim Five), *id.* at 38-40; unjust enrichment (Claim Seven), *id.* at 41-42; and civil conspiracy (Claim Nine).  *Id.* at 43-44. Ms. Hughes's claims are identical to those of Mr. Pierce, Ms. Cumming, and the Photobucket User Class, which are not subject to arbitration.  Mr. Hughes's claims, which are also the claims of the Photographed Class, are nonarbitrable, which includes claims for violation of state privacy laws and common law (Claim Two), Docket No. 51 at 31-32; unjust enrichment (Claim Seven), *id.* at 41-42; and civil conspiracy (Claim Nine).  *Id.* at 43-44.  Furthermore, plaintiffs bring claims against "Unknown Defendants" who "have licensed Plaintiffs photos from Photobucket and used them for applications including biometric and generative artificial intelligence applications."  *Id.* at 4-5, ¶ 13. All of the claims in this action arise out of Photobucket's alleged distribution of plaintiffs' photos for use in artificial intelligence training.  *See generally id.*

Given the significant overlap between the arbitrable claims and nonarbitrable claims and potential for a preclusive effect, the Court finds that a stay of this proceeding pending arbitration is warranted.  *See Adams v. Modernad Media, LLC*, No. 12-cv-00513-PAB-MEH, 2013 WL 674024, at *7 (D. Colo. Feb. 25, 2013) (granting a stay where the arbitration proceedings could have a preclusive effect on one of plaintiff's claims for relief, the arbitration proceedings "could significantly reduce the scope of facts at issue," and there was a strong possibility witnesses would be required to testify during arbitration and again in during discovery); *Stanek Holdco, Inc.*, 2020 WL 4753895, at *7 (granting a stay to avoid "inconsistent and/or piecemeal ruling" and there was the possibility for a preclusive effect on defendant's counterclaim).  The Tenth

Circuit has described administrative closure as being "the practical equivalent of a stay."

*Quinn v. CGR*, 828 F.2d 1463, 1465 & n.2 (10th Cir. 1987).  Thus, the Court will

administratively close this case pending resolution of the parties' claims in arbitration.

*See Green v. Fishbone Safety Sols., Ltd*., 303 F. Supp. 3d 1086, 1101 (D. Colo. 2018)

("it is standard practice in this district for courts to administratively close, rather than

stay, cases pending resolution of the parties' claims in arbitration").

## IV.    CONCLUSION

Therefore, it is

**ORDERED** that Defendant Photobucket.com Inc.'s Motion to Compel Arbitration

and Stay Proceedings [Docket No. 19] is **DENIED as moot**.[12]  It is further

**ORDERED** that Defendant Photobucket.com Inc.'s Amended Motion to Compel

Arbitration and Stay Proceedings [Docket No. 25] is **GRANTED in part and DENIED**.  It

is further

**ORDERED** that Defendant Photobucket.com, Inc.'s Motion to Dismiss the

Amended Complaint [Docket No. 54] is **GRANTED in part**.[13]  It is further

**ORDERED** that the portions of plaintiffs' claims that seek monetary damages are

**DISMISSED without prejudice** for lack of subject matter jurisdiction.  It is further

---

[12] The Court denies this motion as moot because Photobucket filed an amended
motion to compel arbitration "to reflect an earlier account creation date for Ms. Hughes,
which information was discovered through further investigation in response to Plaintiffs'
request for information, and address the applicable California law resulting from the
terms of use in effect on such creation date."  Docket No. 25 at 1 n.1.

[13] Because the Court finds a stay of this action to be appropriate, the Court will
deny without prejudice that portion of Photobucket's motion to dismiss, Docket No. 25,
that does not pertain to subject matter jurisdiction with leave to refile the motion upon
completion of the arbitration proceedings.

**ORDERED** that Ms. Hughes shall proceed to arbitrate her dispute according to the provision of the arbitration agreement between her and Photobucket in accordance with this order.  It is further

**ORDERED** that this case shall be administratively closed, subject to reopening by any party upon a showing of good cause, pursuant to D.C.COLO.LCivR 41.2.

DATED March 10, 2026.

BY THE COURT:

s/ Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge